838 A.2d 663

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Raymond JOHNSON, Appellant.**

Supreme Court of Pennsylvania.

Submitted Oct. 21, 2002.

Decided Dec. 18, 2003.

Reargument Denied Feb. 19, 2004.

John J. McMahon, Jr., West Conshohocken, for Raymond Johnson, Appellant.

Mark Carlyle Baldwin, Alisa Rebecca Hobart, Reading, Amy Zapp, Harrisburg, for the Com. of PA, Appellee.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

### *OPINION*

Justice SAYLOR.

This is a capital, direct appeal.

On the evening of June 18, 1996, in connection with a territorial dispute between groups involved in the sale of illicit drugs, Louis Combs ("Combs" or the "victim"), was fatally shot in a breezeway next to 437 Schuylkill Avenue in the City of Reading. Following investigation, Appellant, Raymond Johnson ("Appellant" or "Johnson"), was charged with criminal homicide and related offenses, and a warrant was issued for his arrest, followed by a fugitive warrant. Johnson was finally taken into custody in New York in February of 1998.

The Commonwealth provided notice of its intention to seek the death penalty, and a jury trial ensued in September, 2000. In the guilt phase, the Commonwealth proffered, *inter alia,* eyewitness accounts identifying Johnson as the killer, and Johnson presented alibi witnesses, although he did not himself testify. The jury returned a verdict of guilt, *inter alia,* on the charge of first-degree murder, and, following a penalty hearing, rendered a death verdict. The jurors found that the aggravating circumstance entailing involvement, association or competition with the victim in the sale, manufacture, distribution or delivery of illegal drugs, *see* 42 Pa.C.S. § 9711(d)(14), outweighed mitigating factors concerning the character and record of the defendant and the circumstances of the offense, 42 Pa.C.S. § 9711(e)(8). New counsel was appointed for purposes of direct appeal; after the filing of an initial brief, an additional substitution of counsel occurred, accompanied by the filing of a supplemental brief raising additional claims.

In his initial statement of questions involved, Johnson identified the following eight issues: a claim of trial court error in the admission of testimony from Nicole Ramsey ("Ramsey"), who was associated with Johnson in drug trafficking, concerning other-crimes evidence; a claim of ineffective assistance of trial counsel in failing to request a cautionary, limiting instruction regarding other-crimes evidence; a claim of trial court error in the admission of Ramsey's testimony concerning inculpatory statements made to her by a third participant in Johnson's illicit-drug-trade group (known only as Izod or Ike); a claim of trial court error in permitting Ramsey's testimony to be read to jurors by the court reporter during their deliberations; claims of trial court error in overruling an objection to the district attorney's closing-speech reference to the absence of an identified alibi witness, and of ineffective assistance of counsel for failing to request a mistrial following such reference; a claim of trial court error in permitting testimony concerning remarks made by Johnson and a fourth participant in his drug trade, defense witness Adrian Starks ("Starks"), to Commonwealth witness Jackie Cook ("Cook") before trial while the men were incarcerated; a claim of trial

court error in the issuance to the jury of a flight/concealment charge; and a claim that the evidence adduced at trial was insufficient to establish the Section 9711(d)(14) aggravator. Johnson also raised several other issues and claims in the argument section of his brief, most of which are interrelated with those set forth in the statement of questions presented. Further, in his supplemental brief, Johnson argued that the initial jury selection process was tainted due to a racially imbalanced jury pool, and that trial counsel was ineffective in failing to: object to the district attorney's questioning of Starks during the defense case concerning his brother's arrest for murder in an unrelated criminal case; request an instruction that life imprisonment means life imprisonment without the possibility of parole; and investigate, develop, and present mental health and personal history mitigation evidence.

## I. Evidentiary Sufficiency

This Court's automatic review of the sufficiency of the evidence in capital cases is accomplished on consideration of the evidence viewed in the light most favorable to the Commonwealth (as the verdict winner), as well as reasonable inferences that may be drawn from it, and entails consideration of whether such evidence and inferences would permit a jury to find, beyond a reasonable doubt, the existence of every element of the crime. *See Commonwealth v. Simmons*, 541 Pa. 211, 223, 662 A.2d 621, 627 (1995). The Commonwealth must establish the fact of a person's unlawful killing, as well as the defendant's involvement in the killing, action with specific intent to kill, and deliberateness. *See Commonwealth v. Spotz*, 552 Pa. 499, 506–07, 716 A.2d 580, 583 (1998).

Here, the gunshot wound to a vital part of the victim's body permitted the jury to infer that the shooter acted with the requisite specific intent. *See id.* The Commonwealth presented testimony from four witnesses to establish that Johnson was the killer: Cook, Spenser Branford ("Branford"), Ramsey, and former detective Bruce Dietrich ("Detective Dietrich").

Cook's testimony served both as an eyewitness account of the killing and to establish Johnson's motive. He described his participation in drug trafficking with Combs in the local area, and Combs' concern with another group, headquartered at 437 Schuylkill Avenue, which had begun to compete for area sales. According to Cook's account, on two consecutive days, he and Combs confronted Starks, who they suspected was a member of the rival group; on the second occasion (the afternoon of the killing), accompanied by Branford and in the vicinity of 437 Schuylkill Avenue, Cook demanded to speak with Starks' supplier. Starks left and returned a short time later with Johnson. Johnson and Combs then entered a breezeway, while Cook remained on the sidewalk in a position that allowed him to observe the men as they talked. After a few moments, he saw Johnson pull a gun from his waist, extend his arm, and shoot Combs in the abdomen. Cook testified that he then fled, and, as he was running, noticed another member of Johnson's group, known only as Izod or Ike, in the vicinity. Cook also described his later encounter with Johnson and Starks while the three were incarcerated in Berks County Prison, which he interpreted as a warning against his incriminating Johnson in the killing.

Branford's testimony also concerned the encounter between Johnson and the victim, and was, in many material respects, corroborative of Cook's, although Branford was not physically in a position to see the actual killing.

Ramsey testified to her sale of illegal drugs for Johnson in the relevant time period. Ramsey indicated that Johnson experienced problems with Combs for some time prior to the murder, which, she believed, resulted from the fact that Johnson and Izod, whom she described as Johnson's "right-hand man," were selling drugs in proximity to Combs' operations. She recalled overhearing conversations between Johnson and Izod on the subject, during which Johnson would "get mad, and [say] he was going to handle that. And they didn't know who they were playing with." She was also present during a confrontation between Combs and Izod that occurred approximately two weeks before the murder, which, she ex-

plained, "was basically about turf. . . . Like I said, it had been going on for a while. And [Combs] said to Izod he was not going to take food out of our mouths. You know how we do it in New York."

Ramsey also testified that, on the day of the killing, Johnson had been at her apartment, was carrying a weapon, and had repeatedly expressed his anger with Combs. Ramsey recalled Johnson placing several calls from a nearby telephone booth throughout the day and receiving separate visits from Starks (whom Ramsey also identified as selling drugs for Johnson) and Izod; during the latter's visit she overheard the two discussing "something about handling that." Ramsey later learned that something had occurred on Schuylkill Avenue and, upon investigation, received a message to page Izod and Johnson. She recounted that, upon responding to the page, Izod informed her that "we did them n_____s. You didn't think we would, but we did. There is not going to be a problem."

Detective Dietrich was the lead investigator for Combs' killing. He explained that he obtained a warrant for Appellant's arrest in June, 1996, but was unable to locate him until February, 1998, when he learned that Johnson had been taken into custody in New York. The detective also detailed his efforts to locate Johnson in both Reading and New York, testifying that he: contacted Johnson's friends and relatives in Reading; checked addresses that Johnson was known to frequent; and traveled to New York, where he spoke with more of Johnson's friends and relatives. He further explained that he advised individuals with whom he spoke that he held a warrant for Johnson's arrest.

In light of the above, the jury's determination that Appellant deliberately perpetrated Combs' killing rests on a sufficient evidentiary foundation.

■ As noted, Appellant lodged a specific challenge to the sufficiency of the evidence to support the aggravating circumstance found by the jury. *See* 42 Pa.C.S. § 9711(d)(14). In this regard, he contends that the evidence was insufficient to

support the Commonwealth's theory that Combs was killed as a consequence of a drug-sale-related rivalry between him and Johnson at 437 Schuylkill Avenue. Although Johnson concedes that Combs was angry that drug sales were being diverted by someone at that location, he argues that the Commonwealth's evidence failed to establish that Combs knew the identity of the competitor. In this respect, Johnson discounts several, discrete aspects of the Commonwealth's evidence, such as Ramsey's testimony, which tended to show competition in drug trafficking, as lacking in specificity and concreteness. Furthermore, he suggests that the Commonwealth's case was weakened by the inability of prosecution witnesses to recount the conversation between Johnson and Combs that transpired immediately prior to the killing.

Under Section 9711(d)(14), a capital defendant is eligible for the death penalty if the jury unanimously finds the following circumstance:

At the time of the killing, the victim was or had been involved, associated or in competition with the defendant in the sale, manufacture, distribution or delivery of any controlled substance or counterfeit controlled substance in violation of The Controlled Substance, Drug, Device and Cosmetic Act or similar law of any other state, the District of Columbia or the United States, and the defendant committed the killing or was an accomplice to the killing as defined in 18 Pa.C.S. § 306(c), and the killing resulted from or was related to that association, involvement or competition to promote the defendant's activities in selling, manufacturing, distributing or delivering controlled substances or counterfeit controlled substances.

42 Pa.C.S. § 9711(d)(14).

Presently, the involvement of Combs in drug trafficking was established primarily via testimony from Cook; Johnson's involvement in such activities was demonstrated primarily through Ramsey.[1] Cook's testimony also established the fact

1. The Commonwealth did not present additional evidence during the penalty phase, but merely incorporated the record of the guilt phase in support of the Section 9711(d)(14) aggravator.

of competition, although, viewed in isolation, it would not be sufficient to implicate Johnson. Ramsey indicated, however, that Johnson was specifically aware of the competition between his and Combs' groups. Combined with the evidence that Johnson was summoned to the scene of the killing when Combs and Cook approached Starks (who was linked to Johnson's drug trafficking via Ramsey's testimony) and Cook asked to meet with Starks' supplier, as well as the statement from Izod (as recounted by Ramsey) implicating himself and another in the killing, the evidence is sufficient to support the inference that the murder was related to the established drug-trade competition. We do not read Section 9711(d)(14) as requiring the degree of specificity in the geographic boundaries of each competitor's drug-sale activities which Appellant seems to suggest is necessary, or as precluding satisfaction of the Commonwealth's burden, in whole or in part, by evidence that is circumstantial in character.

■ We recognize that the prosecution against Johnson relied heavily on evidence procured from admitted participants in the illegal drug trafficking endeavors. Nevertheless, in this regard, the jury bears the responsibility to resolve questions of credibility, and, absent extraordinary circumstances, an appellate court will not substitute its judgment for that of the factfinder. *See Commonwealth v. Rice*, 568 Pa. 182, 193–94, 795 A.2d 340, 346 (2002). Here, viewed in the light most favorable to the Commonwealth, and employing reasonable inferences, the evidence was sufficient to establish the Section 9711(d)(14) aggravator beyond a reasonable doubt.

## II. Claims of Trial Court Error
### A. Claims relating to Ramsey's testimony
#### i. other-crimes evidence

■ In his first of several claims related to Ramsey's testimony, Johnson contends that the trial court erred by permitting her to testify concerning other-crimes evidence, namely, Johnson's involvement in drug trafficking, including Ramsey's, Starks', and Izod's sale of illegal drugs on his

behalf. Johnson acknowledges that such evidence, while generally inadmissible to demonstrate character attributes, *see* Pa.R.E. 404(b)(1), may be properly admitted where it is relevant to establish motive. *See* Pa.R.E. 404(b)(2). He also recognizes that the Commonwealth's theory of the case was that Combs was killed in connection with a territorial rivalry among drug traffickers. However, in a manner similar to his argument concerning the sufficiency of the evidence to establish the Section 9711(d)(14) aggravating circumstance, Johnson claims that the Commonwealth's evidence was too attenuated to support the use of the drug-sale rivalry motivation as evidence of his guilt. For example, he asserts that the Commonwealth failed to establish at trial that either Ramsey or Starks was involved in a drug organization run by Johnson that had a rivalry with Combs in the vicinity of 437 Schuylkill Avenue. In particular, Johnson argues, Ramsey indicated that Starks never told her where he sold drugs for Johnson, thus diminishing any probative value of drug rivalry at the Schuylkill Avenue location. Furthermore, Johnson contends, it was not established at trial that Starks knew of any rivalry between Johnson and Combs, was part of such, or was in any manner connected to the possible motive for the victim's death. Johnson notes that the victim's drug trafficking collaborator, Cook, who summoned Starks' supplier to the scene of the killing, was not aware whom Starks would bring. Even assuming that the evidence was properly admitted, according to Johnson, the trial court erred in failing to issue a cautionary, limiting instruction during the course of Ramsey's testimony. Although Johnson acknowledges that the court did include in its general charge after the close of the evidence an admonition that the jurors should consider other-crimes testimony solely for the purpose of evidencing motive,[2] he contends

---

2. The court stated:

> You have heard evidence tending to prove that the defendant was involved in other improper conduct for which he is not on trial. I am speaking of the testimony to the effect that the defendant was involved in drug trafficking.
>
> This evidence is before you for a limited purpose, that is, for the purpose of tending to show motive. This evidence must not be considered by you in any way other than for the purpose I just stated.

that this simply could not serve as an adequate substitute for a contemporaneous charge. In this regard, Johnson emphasizes the prejudicial impact of other-crimes evidence, and the importance of Ramsey's testimony to the prosecution, particularly since the jurors twice requested to hear it repeated during their deliberations.

On consideration of the above, we conclude that the Commonwealth's reliance on evidence of Johnson's involvement in drug trafficking to establish his motive was permissible under governing evidentiary precepts. Again, Appellant offers no support for his position, interwoven into several of his arguments, that the Commonwealth was bound to establish specific geographic boundaries for the activities of each of Johnson's and Combs' groups to demonstrate the fact of their competition. It is enough, in our view, that prosecution testimony showed a diversion of drug sales from Combs' group to Johnson's, knowledge on the part of both men that there was competition (albeit that Combs may not have been aware of Johnson's identity as his competitor), and Johnson's awareness that Combs was his rival.

■ With respect to the timing of the trial court's limiting instruction, although this Court has expressed a preference that such direction should be given to jurors at the time limited-purpose evidence is adduced, *see Commonwealth v. Covil*, 474 Pa. 375, 383–84, 378 A.2d 841, 845 (1977), it has held nonetheless that a required limiting instruction may properly be given during the general charge. *See id.; cf. Commonwealth v. Spotz*, 563 Pa. 269, 280, 759 A.2d 1280, 1286 (2000). In light of such precedent, and particularly as Appellant did not request an instruction at the time the limited-purpose

You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt. If you find the defendant guilty, it must be because you are convinced by the evidence that he committed the crime charged and not because you believe he is wicked or has been involved in improper conduct.
N.T., at 528.

evidence was adduced, we find no abuse of discretion on the part of the trial court.[3]

Johnson also contends that Ramsey's testimony to the effect that Starks also sold drugs for Johnson was inadmissible hearsay. The record suggests, however, that Ramsey testified from her personal knowledge and not, as Johnson asserts, from repetition of hearsay declarations. *See generally* N.T., at 316–19. We recognize that trial counsel lodged various objections in an attempt to force the Commonwealth to develop a more specific foundation for Ramsey's knowledge in this regard, and that it would have been preferable for the trial court to require the additional record development of foundation. Nevertheless, in light of Ramsey's testimony as to her own involvement in Johnson's drug trade and personal knowledge of Starks, we believe that the trial court acted within the bounds of its discretionary decision making authority as concerns matters connected with the admission of evidence. *See generally Commonwealth v. Billa*, 521 Pa. 168, 177–78, 555 A.2d 835, 840 (1989).

### ii. statements concerning Izod

Appellant argues that the trial court erred by permitting Ramsey to testify that Izod was his "right-hand man" in drug trafficking. The Commonwealth contends, correctly, however, that this testimony is not hearsay, since it does not involve an extrajudicial statement, but rather an observation based on Ramsey's personal knowledge of Johnson's drug-trade activities. *Accord Commonwealth v. Hashem*, 363 Pa.Super. 111, 153, 525 A.2d 744, 764 (1987) (quoting a trial court's observation that "[i]t is hornbook law that what a person knows firsthand from his own knowledge is not hearsay" (citations omitted)), *rev'd on other grounds*, 526 Pa. 199, 584 A.2d 1378 (1991).

**3.** Appellant also claims that trial counsel was ineffective for failing to request such a contemporaneous instruction. As discussed below, however, this Court has recently held that such claims challenging the stewardship of counsel are more appropriately reserved for collateral review. *See infra* (citing *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002)).

Additionally, Appellant claims that Ramsey's testimony that she overheard conversations between Johnson and Izod about drug-sale locations, which she believed included places where Combs sold drugs, was not relevant to establish motive on account of a lack of specificity. This argument fails, since we have rejected the position that the Commonwealth was burdened with an obligation to develop a precise picture of the geographic overlap in drug sales to establish the competitive relationship between Johnson's and Combs' activities. *See supra.*

Next, Appellant argues that the trial court erred by allowing testimony from Ramsey indicating that, approximately two weeks before Combs' murder, she overheard Izod and Combs having an argument about "turf," in which Combs told Izod that he was not going to let Izod "take food out of our mouths." According to Johnson, the testimony was objectionable as hearsay which was not relevant to establish motive, since it was not probative of the Commonwealth's theory that Johnson killed Combs over a drug rivalry at 437 Schuylkill Avenue. Moreover, Johnson emphasizes that the statement did not involve him, but rather, reflects a conversation between Combs and Izod. Therefore, he claims, this statement cannot be attributed to or otherwise connected with him, absent some other relational evidence. In this regard, Appellant views Ramsey's testimony, and other indications in the record of Izod's affiliation with his group, as insufficient.

The trial court's reasons for admitting this statement are unclear, since it did not address the matter either at trial or in its opinion. While we agree with the Commonwealth's position that the statement bears a relationship to its motive evidence, as it tends to show competition in drug sales, this merely establishes relevance, and its character as hearsay must be evaluated to determine its admissibility. The Commonwealth contends that the statement was not offered for the truth of the matter asserted; however, the statement may be read to embody the fact of competition in the drug trade, which the Commonwealth sought to prove to suggest Johnson's guilt. We conclude, however, that any error by the trial

court in the admission of the statement is harmless, as it is cumulative of other evidence, in particular, Cook's descriptions from his personal observation concerning the impact of sales from the 437 Schuylkill Avenue location on his and Combs' drug trade, *see, e.g.,* N.T., at 257, 263–64, as well as Cook's prior, unopposed testimony that Combs sought to address the issue, N.T., at 263–64. *See generally Commonwealth v. Young,* 561 Pa. 34, 85, 748 A.2d 166, 193 (2000) (on reconsideration) (articulating the three, alternative bases on which a determination of harmless error may be predicated, including that the erroneously admitted evidence was merely cumulative of other untainted, substantially similar evidence); *Commonwealth v. Story,* 476 Pa. 391, 411 & n. 20, 383 A.2d 155, 165 & n. 20 (1978) (collecting cases in which errors were found harmless on the basis that improperly admitted evidence was cumulative and its admission did not prejudice the defendant's right to a fair trial).

### iii. Izod's coconspirator declaration

 Johnson contends that the trial court erred in admitting Ramsey's recounting of Izod's inculpatory comments to her, as follows: "[W]e did them n_____s. You didn't think we would, but we did. There is not going to be a problem." In this regard, he takes issue with the trial court's conclusion that such statements qualified for treatment under the coconspirator exception to the hearsay rule, *see* Pa.R.E. 803(25)(E). Citing to *Commonwealth v. Zdrale,* 530 Pa. 313, 608 A.2d 1037 (1992), Johnson correctly recites the requirements of the coconspirator exception: the existence of a conspiracy between the declarant and the defendant must be demonstrated by a preponderance of the evidence; the statements must be shown to have been made during the course of the conspiracy; and they must have been made in furtherance of the common design. *See id.* at 317, 608 A.2d at 1039. According to Johnson, however, the above remarks meet none of these requirements. Primarily, Johnson argues that the trial court's finding of a conspiracy between Izod and Appellant to murder Combs is unsupported in the evidence proffered by the Commonwealth, particularly as Johnson was not charged

with conspiracy, he did not initiate the meeting that resulted in Combs' death but was summoned by Cook, and there is no evidence that Izod was ever charged with any crime in relation to Combs' death. Although Johnson's argument contains a near concession that the Commonwealth effectively demonstrated an illegal drug conspiracy ("[a]t best, the Commonwealth established a conspiracy between Izod and [A]ppellant to distribute drugs"), he discerns no material significance from such fact. Further, Johnson contends that the Commonwealth failed to meet the second and third requirements of the coconspirator exception (demonstration that the statement was made during the course of the conspiracy and in furtherance of the common design), particularly as Izod's comments were made after the occurrence of the shooting.

Application of the coconspirator exception to the hearsay rule is predicated on agency principles—when the elements of the exception are established, each conspirator is considered an agent of the other, and therefore, a statement by one represents an admission by all.[4] As Johnson acknowledges, to meet the first requirement of the exception (existence of a conspiracy), the Commonwealth's burden is gauged according to a preponderance standard, and conspiracy may be inferentially established, for example, by relation, conduct, or circumstances of the parties. *See Commonwealth v. Mayhue*, 536 Pa. 271, 293, 639 A.2d 421, 432 (1994); *Commonwealth v. Pinkins*, 514 Pa. 418, 424, 525 A.2d 1189, 1191 (1987). No formal charge of conspiracy is necessary. *See Common-*

---

**4.** In *Anderson v. United States*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974), the United States Supreme Court explained:

> The rationale for both the hearsay-conspiracy exception and its limitations is the notion that conspirators are partners in crime. As such, the law deems them agents of one another. And just as the declarations of an agent bind the principal only when the agent acts within the scope of his authority, so the declaration of a conspirator must be made in furtherance of the conspiracy charged in order to be admissible against his partner.

*Id.* at 218 n. 6, 94 S.Ct. at 2259 n. 6 (citations omitted); *accord Commonwealth v. Sullivan*, 472 Pa. 129, 159–60, 371 A.2d 468, 482–83 (1977) (plurality); *Commonwealth v. Timer*, 415 Pa.Super. 376, 384, 609 A.2d 572, 575 (1992). *See generally* Pa.R.E. 803(25) (including statements of coconspirators under admissions of party-opponents).

*wealth v. Coccioletti,* 493 Pa. 103, 113, 425 A.2d 387, 392 (1981); *Commonwealth v. Dreibelbis,* 493 Pa. 466, 426 A.2d 1111 (1981).

Here, the trial court held that Ramsey's and Cook's testimony provided the Commonwealth with ample direct and circumstantial evidence that proved that Appellant, Izod, and Starks conspired to murder Combs so that they could take over his drug territory. In our view, however, the evidence of such a conspiracy is more modest than ample, although it was at least arguably sufficient to satisfy the Commonwealth's burden concerning the first requirement of the coconspirator exception.[5] However, there is little evidence that the statement by Izod made to Ramsey was made in furtherance of a conspiracy to commit murder. Generally, it has been held that, in order to satisfy the in-furtherance-of requirement of the coconspirator hearsay exception, it is sufficient for the government to establish an intent to promote the conspiratorial objective. *See, e.g., United States v. McCullah,* 76 F.3d 1087, 1103 (10th Cir.1996). In a number of circumstances, however, where as here, the inculpatory statements are narrative declarations of past activity made to a nonparticipant in the asserted conspiracy, courts have found the essential in-furtherance-of attribute absent. *Cf. United States v. Johnson,* 200 F.3d 529, 533 (7th Cir.2000) (citing cases distinguishing statements made in furtherance of a conspiracy from, *inter alia,* narrative declarations); *United States v. Provenzano,* 620 F.2d 985, 1001 (3d Cir.1980) (distinguishing statements made to third parties from those made to coconspirators); *accord United States v. Gibbs,* 739 F.2d 838, 845 (3d Cir.1984) (observing that "statements made to those who are not involved in the conspiracy are not 'in furtherance' of it"). *See generally* 23 C.J.S. CRIMINAL LAW § 990 (2002)

**5.** Testimony of Ramsey and Cook indicated that: Johnson and Izod were associates in drug trafficking; the victim was their rival; Johnson and Izod had been overheard, on various occasions, discussing the competition for drug sales; members of Johnson's group had been involved in confrontations with the victim prior to his murder; Johnson and Izod were together on the day of the murder and were overheard discussing "something about handling that"; and Izod was observed near the site of the shooting immediately after its occurrence.

("Generally speaking, unauthorized admissions or confessions, or casual admissions of guilt, cannot be considered in furtherance of the conspiracy or enterprise and are inadmissible." (footnotes omitted)).[6]

 Nevertheless, we believe that any error on the part of the trial court in articulating a basis for the admission of Izod's inculpatory remarks is harmless, since the coconspirator exception contains no requirement that the conspiracy identified as the basis for admissibility be related to the crime charged. *See United States v. Lara*, 181 F.3d 183, 196 (1st Cir.1999) ("Subject to relevancy and similar considerations, out-of-court statements of a declarant coconspirator, if made during and in furtherance of a conspiracy, are admissible for the truth of the matter asserted, regardless of whether the conspiracy furthered is charged or uncharged, and regardless of whether it is identical to or different from the crime that the statements are offered to prove[.]" (citations omitted)); *cf. Coccioletti*, 493 Pa. at 113, 425 A.2d at 392 ("This Court has extended the co-conspirator exception to admit declarations by 'co-participants' in a crime even where conspiracy has not been charged or proven." (citations omitted)).[7] Here, as

6. Although Johnson discusses the Commonwealth's asserted failure to meet the in-furtherance-of requirement as a claim of trial court error, his objection at trial, and his statement of matters complained of on appeal, *see* Pa.R.A.P.1925, implicated only the issue of whether the Commonwealth had met the existence-of-a-conspiracy requirement. As a general rule, therefore, these claims would be considered waived. *See Commonwealth v. Stoltzfus*, 462 Pa. 43, 60, 337 A.2d 873, 881 (1975) ("if the ground upon which an objection is based is specifically stated, all other reasons for its exclusion are waived, and may not be raised post trial"); *Commonwealth v. Lord*, 553 Pa. 415, 420, 719 A.2d 306, 309 (1998) ("Any issues not raised in a [Rule] 1925(b) statement will be deemed waived."). However, we will consider the question pursuant to the relaxed waiver doctrine, since the submission of briefs in this appeal predates this Court's modification of the relaxed waiver doctrine in *Commonwealth v. Freeman*, 573 Pa. 532, 561-563, 827 A.2d 385, 403 (2003).

7. *Accord United States v. Marino*, 277 F.3d 11, 26 (1st Cir.2002) (observing that whether a statement was made in the context of a separate conspiracy or as part of a larger conspiracy makes no difference in terms of admissibility under the coconspirator exception); *United States v. Bowe*, 221 F.3d 1183, 1193 (11th Cir.2000) (noting that "the conspiracy that forms the basis for admitting a co-conspirator's out of court

Johnson essentially concedes, the Commonwealth's evidence demonstrated, by a clear preponderance, a larger conspiracy between Appellant and Izod to distribute illegal drugs. Significantly, this is a conspiracy as to which the evidence demonstrated that Ramsey was not a third party, but a participant. In the course of Izod's remarks to Ramsey, he advised her of an act that eliminated a rival seller, thus promoting the objectives of the drug conspiracy, and instructed her to maintain a low profile for the time being to avoid detection in light

> statements need not be the same conspiracy for which the defendant is charged"); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir.1999) (same); *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir.1993) (same); *United States v. Ellis*, 156 F.3d 493, 497 (3d Cir.1998) ("The law is well settled that out-of-court statements may be admissible under [the coconspirator exception] even if the defendant is not formally charged with any conspiracy in the indictment."); *United States v. Godinez*, 110 F.3d 448, 454 (7th Cir.1997) (same); *United States v. Manning*, 56 F.3d 1188, 1197 (9th Cir.1995) (same); *United States v. DeVillio*, 983 F.2d 1185, 1193 (2d Cir.1993) (same). *See generally* CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, 4 FEDERAL EVIDENCE § 426 (2d ed. 2003) ("The [coconspirator] exception operates even if no conspiracy charges are brought, or the charged conspiracy differs from (or is not as broad as) the one suggested as the basis for admitting coconspirator statements." (footnotes omitted)).

> We recognize that the phrasing of the in-furtherance-of requirement in the United States Supreme Court's decision in *Anderson*, 417 U.S. at 211, 94 S.Ct. at 2253, suggests that the declaration of a conspirator must be made in furtherance "of the conspiracy charged." *Id.* at 218 n. 6, 94 S.Ct. at 2259 n. 6; *see also supra* note 4. However, as other courts have observed, *Anderson* did not address an argument that an uncharged conspiracy could not support admission of a coconspirator's statement, but rather,
> > was simply reiterating the established principle that the conspiracy, or common enterprise, must have been in progress at the time the statement sought to be admitted was made. Indeed, ... '[n]o circuit court has ever held that *Anderson* requires that the predicate for admissibility under the exception be the precise conspiracy charged in the indictment.'
> *United States v. Layton*, 855 F.2d 1388, 1400 (9th Cir.1988), *implied overruling on other grounds recognized in People of the Territory of Guam v. Ignacio*, 10 F.3d 608, 612 (9th Cir.1993); *see also Ellis*, 156 F.3d at 497 n. 4 (explaining that *Anderson* applied the common law as it existed prior to the Federal Rules of Evidence, which, in contrast to the federal rules (and Pennsylvania's development of the coconspirator exception as ultimately embodied in our evidential rules), did contain a requirement that the coconspirator's statement be made in furtherance of a charged conspiracy).

of the expected, increased law enforcement activity.[8] *Accord Johnson*, 200 F.3d at 533 (noting that statements made in furtherance of a conspiracy can take a variety of forms, including comments made "to inform other members about the progress of the conspiracy, to control damage to or detection of the conspiracy, to hide the criminal objectives of the conspiracy, or to instill confidence and prevent the desertion of other members").

### iv. the reading of Ramsey's testimony

Johnson claims that the trial court erred in granting the jurors' request for Ramsey's testimony to be read to them during their deliberations, particularly since the trial court did not issue contemporaneous, cautionary instructions.

Generally, the determination whether to grant a request from jurors for a reading of a portion of the trial testimony during deliberations for the purpose of refreshing its recollection rests within the discretion of the trial court. *See Commonwealth v. Peterman*, 430 Pa. 627, 631, 244 A.2d 723, 726 (1968). The reading of the testimony does not implicate reversible error, provided that it does not place undue emphasis on one witness's testimony. *See id.* at 631–32, 244 A.2d at 726.

In the present case, the trial court allowed the testimony to be read only after the jury's second request and undertook considerable precautions to ensure the accuracy of the reading, such as directing that it occur on the record and instruct-

---

8. While Appellant does not raise a specific challenge to Ramsey's account of Izod's statement pursuant to the Confrontation Clause of the Sixth Amendment to the United States Constitution, we note that the federal analogue to Pennsylvania's coconspirator exception has been described as firmly-rooted for purposes of the federal Confrontation Clause. *See Bourjaily v. United States*, 483 U.S. 171, 183, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987). *See generally Commonwealth v. Robins*, 571 Pa. 248, 261, 812 A.2d 514, 522 (2002) (opinion announcing the judgment of the Court, joined by Saylor, J., on this point) (explaining that extrajudicial declarations within firmly-rooted hearsay exceptions are deemed sufficiently reliable to satisfy Confrontation Clause requirements, without the need for further inquiry into their reliability).

ing the jurors that their own recollection should control in the event of any inconsistencies. In addition, the court required that the testimony be read in its entirety, including the direct and cross-examinations, so that neither portion received greater emphasis. Further, the jury previously received a detailed instruction from the court that the evidence regarding Johnson's drug involvement was admitted solely for the purpose of establishing motive, *see supra,* which instruction the jury is presumed to have followed. *See Commonwealth v. Baker,* 531 Pa. 541, 559, 614 A.2d 663, 672 (1992). In such circumstances, we find little basis for concluding that the trial court abused its discretion in granting the jury's request.

### B. Claim of prosecutorial misconduct

Appellant next raises an issue concerning commentary by the district attorney regarding his failure to produce an alibi witness.

By way of background, Johnson's defense case included presentation of two alibi witnesses: his wife at the time of trial, Crystal Johnson, and her friend, Shadena Johnson (who was of no relation to Johnson or his wife). Both testified that Johnson resided in Brooklyn, New York, in June of 1996, and specifically that, at the time the victim was killed, he was with them in Brooklyn at the residence of Alice Jackson, where he proposed to Ms. Johnson. Johnson, however, did not produce testimony from Ms. Jackson, and, during closing argument, the prosecutor challenged the viability of Johnson's alibi defense with reference to her absence.[9] During and immediately

---

9. The district attorney stated:

 The alibi. June 18, 1996, is not a holiday so it conveniently became the day the defendant proposed to his wife. That made it memorable and also another thing that made it memorable was that the person who's not even related to the defendant Alice Jackson who you didn't see in the courtroom, she wanted to give the defendant a Father's Day present. Where is Alice Jackson? She didn't come here and tell you about the celebration at her house in 1996.

 * * *

 Ask yourself, why not. Not only does this person who is unrelated to the defendant but yet buys a Father's Day present and the defendant shows up at her house and proposes to his wife to get engaged on a

after the Commonwealth's argument, defense counsel objected, on the latter occasion requesting a curative instruction, asserting that the Commonwealth was not entitled to a missing witness inference where the testimony of the absent witness is cumulative, the uncalled witness is equally available to both parties, and there is a satisfactory explanation as to why the party failed to call the witness.[10] The court sustained this objection and, after the conclusion of the closing speeches, instructed the jury as follows:

> [D]uring the Commonwealth's closing argument there was mention made that the defendant did not call a certain witness perhaps from New York on his behalf. And you're not to take any negative inference against the defendant for any witnesses that were not produced by him ... [T]he defendant has no obligation to take the stand, [and] the defendant has no obligation to call any witnesses or present any evidence. So there would be no negative inference taken by you against the defendant because of anybody he didn't call ... You are not to make any negative findings or inferences against the defendant for not calling additional witnesses.

N.T., at 515–16.

Generally, a prosecutor's comments will not establish a ground for relief from a conviction unless their unavoidable effect was to prejudice the jurors, forming in their minds a fixed bias and hostility toward the defendant, so that they could not weigh the evidence objectively and render a true verdict. *See Commonwealth v. Hawkins*, 549 Pa. 352, 373, 701 A.2d 492, 503 (1997). Moreover, the prejudicial effect of improper comments may be cured by a cautionary instruction.

> Wednesday night. [Detective] Dietrich said it wasn't a Wednesday night. [June 18th] was a Tuesday night. [Detective Dietrich] didn't happen to remember that. He knew that because it's documented in the homicide report. Maybe the defendant did propose to his wife on Wednesday because we know he was nowhere to be found in Reading after June 18, 1996. Maybe she was right, it was Wednesday. N.T., at 511–12.

**10.** Apparently, Ms. Jackson, who resides in New York, was suffering from cancer.

*See Commonwealth v. Jones*, 542 Pa. 464, 511, 668 A.2d 491, 514 (1995); *see also Baker*, 531 Pa. at 559, 614 A.2d at 672 ("The presumption in our law is that the jury has followed instructions."). Here, regardless of the propriety of the Commonwealth's comments,[11] there is no evidence that the trial court's detailed cautionary instructions failed to cure any potential, prejudicial effect. *Accord Jones*, 542 Pa. at 513, 668 A.2d at 515 (concluding that, to the extent that a prosecutor's comments could be interpreted as shifting the burden of proof to the defense, the trial court's cautionary instructions that it was not the defendant's responsibility to call any witnesses, and that the Commonwealth had the burden of proof, adequately cured any prejudice).

### C. Claims related to Cook's testimony

Appellant contends that, for several reasons, the trial court erred in permitting Cook's testimony regarding his encounter with Johnson and Starks at Berks County Prison before trial. He challenges the following exchange which took place between the district attorney and Cook at trial:

Q Did the defendant say anything to you?

A He said, don't let these crackers kill me.

\* \* \*

Q Did he say anything else?

A [Starks] said, it's kind of f____ed up when people's families die, you know what I'm saying.

Q What happened next?

A I was just looking, like, bugged out. I was like, all right, all right. I understand. I got you. The defendant said the same thing.

---

**11.** The Commonwealth argues that the statements were proper under *Commonwealth v. Yarris*, 519 Pa. 571, 597, 549 A.2d 513, 526 (1988) (holding that the prosecutor's comments, pertaining to the defendant's failure to present a certain alibi witness, was not improper, "for it merely challenged [the defendant's] failure to produce a witness who would have corroborated [the defendant's] testimony"). As Johnson did not testify and did produce two corroborating witnesses in support of the alibi defense, the present factual circumstances vary from those addressed in *Yarris*.

Q What did he say?

A Its' [sic] kind of f___ed up when people's families die.

Q. Did the defendant say anything in addition about you testifying in the trial?

A He said I shouldn't testify. . . .

* * *

Q Did you know what he meant when he said crackers?

A You know, like the jury, you know the D.A., and all of you. . . .

Q Okay. How did you interpret what they said to you, when they said, it's kind of f___ed up when people's families die?

A I kill my people or something, you know what I mean. N.T., at 277–78.

Appellant does not dispute that the Commonwealth may introduce evidence of threats made to a witness to demonstrate the defendant's consciousness of guilt. *See, e.g., Commonwealth v. Lark,* 518 Pa. 290, 308–09, 543 A.2d 491, 500 (1988). He contends, however, that in the present case it is not clear that the comments were intended as a threat to Cook. Also, Johnson finds the comments objectionable as they informed the jury that he was incarcerated, thereby prejudicing him in the eyes of the jurors. Finally, because the statement contains hearsay statements made by Starks, Johnson contends that it should have been deemed inadmissible against him.

 This Court has long recognized that any attempt by a defendant to interfere with a witness's testimony is admissible to show a defendant's consciousness of guilt. *See, e.g., Commonwealth v. Johnson,* 542 Pa. 384, 398–99, 668 A.2d 97, 104 (1995) (concluding that a witness's testimony that a defendant offered him a bribe not to testify at trial was admissible to show the defendant's consciousness of guilt); *Commonwealth v. Goldblum,* 498 Pa. 455, 472, 447 A.2d 234, 243 (1982) (citing cases for the proposition that the Commonwealth may demonstrate consciousness of guilt through at-

tempts by a defendant to intimidate *or influence* a witness). Here, regardless of whether or not Johnson's statements constituted threats, it is apparent that they were intended to influence Cook's testimony at trial. Accordingly, they are relevant. Although the evidence was adduced via the testimony of a non-declarant listener, courts generally admit such statements (subject to an assessment of probative value versus prejudicial impact) as verbal acts, a form of nonhearsay. *See, e.g., Tompkins v. Cyr,* 202 F.3d 770, 779 n. 3 (5th Cir.2000); *United States v. Thomas,* 86 F.3d 647, 653 n. 12 (7th Cir.1996); *United States v. Pate,* 543 F.2d 1148, 1149 (5th Cir.1976). This is so, because the evidence is not offered to establish the truth of the matter asserted (here, for example, that people's families die), but rather, to demonstrate the fact of the attempted influencing. *See id.* Moreover, influential statements by third parties have been admitted on identical grounds where, as here, the defendant is aware of and authorizes the statements. *See generally* 29A AM.JUR.2D EVIDENCE § 809 (2003); *accord United States v. Miller,* 276 F.3d 370, 373–74 (7th Cir.2002) (finding that threat against potential witness by person connected with the defendant in several ways was admissible to show the defendant's consciousness of guilt).

■■■ With regard to the revelation by the remarks that Johnson was incarcerated, although generally no reference may be made at trial in a criminal case to a defendant's arrest or incarceration for a previous crime, *see Commonwealth v. Williams,* 541 Pa. 85, 94, 660 A.2d 1316, 1321 (1995), there is no rule in Pennsylvania which prohibits reference to a defendant's incarceration awaiting trial or arrest for the crimes charged. *Cf. Commonwealth v. Wilson,* 538 Pa. 485, 506–07, 649 A.2d 435, 445–46 (1994). Moreover, although the Court has disapproved forcing a defendant, who was incarcerated prior to trial, to attend trial in identifiable prison clothing, this prohibition is based primarily upon the impact that the "constant reminder of the accused's condition implicit in such distinctive, identifiable attire" might have upon the jury. *See Estelle v. Williams,* 425 U.S. 501, 504–05, 96 S.Ct. 1691, 1693,

48 L.Ed.2d 126 (1976); *Commonwealth v. Moore*, 534 Pa. 527, 543–44, 633 A.2d 1119, 1127 (1993) (interpreting the concern over the constant reminder of the defendant's incarcerated status as the focal point of *Estelle*). Here, the reference to Johnson's incarcerated status was passing, and not the type of "constant reminder" proscribed by *Estelle*. *Accord Wilson*, 538 Pa. at 506–07, 649 A.2d at 445–46 (concluding that testimony indicating that the defendant was incarcerated prior to trial was not improper where the jury could reasonably infer that the defendant's detention was the result of the criminal acts for which the defendant was on trial).

## D. Issuance of a flight/concealment charge

Appellant avers that the trial court erred in instructing the jury with respect to flight and/or concealment as circumstantial evidence of his guilt. As he acknowledges, however, where evidence exists that a defendant committed a crime, knew he was wanted, and fled or concealed himself, such evidence is admissible to establish consciousness of guilt. *See Commonwealth v. Tinsley*, 465 Pa. 329, 333, 350 A.2d 791, 792–93 (1976). Johnson contends, nevertheless, that the trial court's instruction was improper, because there was no direct testimony showing that he knew that he was sought after by the police, and the evidence revealed that he resided in New York near the time of the shooting.

A defendant's knowledge may be inferred from the circumstances attendant his flight. *See Commonwealth v. Lester*, 554 Pa. 644, 658, 722 A.2d 997, 1003 (1998) (citing *Commonwealth v. Rios*, 546 Pa. 271, 291, 684 A.2d 1025, 1035 (1996)); *see also Tinsley*, 465 Pa. at 333, 350 A.2d at 793 (concluding that such an inference was justified where the evidence revealed that the defendant abandoned his normal pattern of living without explanation and could not be located at his residence or place of employment or through contacts to his relatives). Here, there was evidence that Johnson disrupted his normal pattern of living following Combs' killing. Further, the police conducted an extensive search spanning Pennsylvania and New York, but were unable to locate Johnson for

over one and one-half years when he was finally taken into custody by the FBI in New York. Johnson's knowledge that he was wanted could be inferred from Detective Dietrich's testimony that he informed Johnson's friends and family in New York that he held a warrant for Johnson's arrest. Additionally, the difficulty in locating Appellant is consistent with Ramsey's testimony that, after Combs' murder, she was told by Izod, who was a member of Johnson's drug-trafficking group, "It's too hot and we [are] laying low." The court therefore properly determined that the Commonwealth presented sufficient evidence to warrant the concealment/flight charge.

### E. Claim of tainted jury selection

Appellant, who is an African–American, claims that the trial court erred in denying his challenge to the array of prospective jurors on the ground that only two out of 161 were of African–American descent. Thus, he contends that it did not reflect a fair cross section of the community, as required under the Sixth and Fourteenth Amendments to the United States Constitution. Further, he argues that Berks County's use of a driver's license list systematically excluded African–Americans from the jury pool. In support of his argument, Johnson invokes statistics that reveal that 9.7% of the population of the City of Reading is comprised of persons of African–American descent.

In response to Johnson's objection at trial, the Commonwealth presented the testimony from the jury supervisor for Berks County, who indicated that a computer had randomly selected the panel from a list of residents having driver's licenses provided by the Commonwealth of Pennsylvania, Department of Transportation, which contained approximately 250,000 names. The Commonwealth notes that Appellant does not have the right to demand that specific numbers of minorities sit on the jury panel which judges him. *See Commonwealth v. Jones,* 452 Pa. 299, 304 A.2d 684 (1973); *Commonwealth v. Craver,* 547 Pa. 17, 27–28, 688 A.2d 691, 696 (1997) ("'Defendants are not entitled to a jury of any particular

composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not *systematically* exclude distinctive groups in the community and thereby fail to be *reasonably* representative thereof.'" (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975) (emphasis in original))).

 To establish a *prima facie* violation of the requirement that a jury array fairly represent the community, Johnson must show that:

> (1) the group allegedly excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such people in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. "Systematic" means caused by or inherent in the system by which juries were selected.

*Craver*, 547 Pa. at 28, 688 A.2d at 696 (citing *Duren v. Missouri*, 439 U.S. 357, 364, 366–67, 99 S.Ct. 664, 668–70, 58 L.Ed.2d 579 (1979)). Proof is required of an actual discriminatory practice in the jury selection process, not merely under-representation of one particular group. *See id.* at 27–28, 688 A.2d at 696. The defendant bears the initial burden of presenting *prima facie* evidence of discrimination in the jury selection process. *See Jones*, 452 Pa. at 312, 304 A.2d at 692.

This Court has rejected various criminal defendant's attacks, on the basis that African–Americans were underrepresented, to the racial composition of a jury panel drawn from voter registration lists. *See Commonwealth v. Bridges*, 563 Pa. 1, 18, 757 A.2d 859, 868 (2000); *Commonwealth v. Henry*, 524 Pa. 135, 144, 569 A.2d 929, 933 (1990). More recently, the reasoning and holdings of those cases have been extended to approve the usage of driver's license lists for purposes of jury selection. *See Commonwealth v. Johnson*, 572 Pa. 283, 305, 815 A.2d 563, 575 (2002) (plurality) ("Absent some showing that driver's license selection procedures are inherently biased, [the defendant] has failed to distinguish jury pool lists

derived from voter registration records from those derived from driver's license registration lists"); [12] *accord Commonwealth v. Cameron,* 445 Pa.Super. 165, 175–76, 664 A.2d 1364, 1369 (1995).

Here, while Johnson presented evidence to suggest that African–Americans were underrepresented, he has not offered evidence or argument revealing systematic exclusion. Therefore, he has failed to establish a constitutional violation.

### III. Claims of Ineffective Assistance of Counsel

■ As noted, in his briefing, Appellant raised a number of claims attacking trial counsel's stewardship, including claims of ineffectiveness for failing to: request an instruction during Ramsey's testimony concerning other-crimes evidence; request a jury instruction that a sentence of life imprisonment precluded the possibility of parole; request a mistrial following assertedly improper arguments by the district attorney; present evidence and adequately cross-examine the jury supervisor in support of Johnson's challenge to the jury panel; adequately cross-examine this witness to reveal the prejudice within the selection process; object to the questioning of Starks regarding his brother's arrest for murder; and investigate, develop and present mental health and personal history mitigation evidence. Pursuant to *Grant,* 572 Pa. at 67, 813 A.2d at 738, these claims are now appropriately matters to be resolved in collateral, post-conviction proceedings and, accordingly, will be dismissed without prejudice to Johnson's rights and/or interests under the Post Conviction Relief Act. *Accord Commonwealth v. Belak,* 573 Pa. 414, 422, 825 A.2d 1252, 1257 (2003); *Commonwealth v. Ramos,* 573 Pa. 605, 611, 827 A.2d 1195, 1199 (2003).

### IV. Statutory review

Our review of the record does not support a conclusion that the jury's verdict was the product of passion, prejudice or any other arbitrary factor. *See* 42 Pa.C.S. § 9711(h)(3)(i).

**12.** Although *Johnson* is a plurality opinion, a majority of the Court was in agreement with respect to the jury selection issue.

Appellant's claims of ineffective assistance of trial counsel are dismissed without prejudice to his rights and/or interests under the Post Conviction Relief Act, and the judgment of sentence is affirmed.[13]

Chief Justice CAPPY files a concurring opinion in which Justice NIGRO joins.

Chief Justice CAPPY concurring.

I join the majority opinion and expressly join the majority's discussion of the co-conspirator exception to the hearsay rule. I write separately, however, to emphasize the standard of proof and the limited nature of the co-conspirator exception to the hearsay rule.

Pennsylvania Rule of Evidence 803(25)(E), entitled "Admission by Party–Opponent," provides for admission of a statement if "[t]he statement is offered against a party and is . . . (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement may be considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E)." The Pennsylvania Rule's federal counterpart is found at Fed. R.Evid. 801(d)(2)(E).[1] The Pennsylvania rule and the federal rule are virtually identical.[2]

To admit a co-conspirator's statement into evidence under this exception, the Commonwealth bears a heavy burden. The Commonwealth must establish by the preponderance of the evidence that: (i) a conspiracy existed; (ii) the defendant and

---

**13.** The Prothonotary is directed to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i).

**1.** Under Rule 801(d)(2)(E) of the Federal Rules of Evidence ("Rule 801"), "a statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

**2.** As noted in the comments to the Pennsylvania Rule, the difference between the federal and Pennsylvania formulations is organizational. It has no substantive effect. Moreover, the admissibility of a statement by a co-conspirator as provided by this rule is consistent with Pennsylvania law. Pa.R.E. 803(25), comment.

58

the declarant were involved in the conspiracy; (iii) the statement was made during the course of the conspiracy; and (iv) the statement was made in furtherance of the conspiracy. *See Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *United States v. Ellis,* 156 F.3d 493, 496 (3rd Cir.1998); Federal Criminal Conspiracy, 40 Am.Crim. L.Rev. 577, 599 (2003).

As noted by the majority, it is widely accepted that out-of-court statements by co-conspirators may be admissible even if the defendant is not formally charged with conspiracy in the indictment. *See, e.g., United States v. Skidmore,* 254 F.3d 635, 638 (7th Cir.2001); *United States v. Lara,* 181 F.3d 183, 196 (1st Cir.1999); *United States v. Asibor,* 109 F.3d 1023, 1034 (5th Cir.1997). When conspiracy is not charged, however, I strongly believe that judges should only admit a co-conspirator's statement if the conspiracy is closely related or "factually intertwined" with the crime for which the defendant is charged. *See Ellis,* 156 F.3d at 497; *United States v. Grossman,* 843 F.2d 78, 83 (2nd Cir.1988); *United States v. Kendall,* 665 F.2d 126, 132 (7th Cir.1981).

This additional requirement is in essence a restatement of ordinary relevancy principles. *Ellis,* 156 F.3d at 497. It is axiomatic that simply because a statement falls within an exception to the hearsay rule does not make this statement per se admissible; only statements which are relevant are admissible in court. In this vein, the introduction of statements from an uncharged conspiracy, thus, might be precluded by application of general rules of the admissibility of evidence. *See id.;* Pa.R.E. 402.

Here while the Commonwealth has not charged Johnson with conspiracy, I am satisfied that the conspiracy that serves as the basis for the admission of the co-conspirator's statement is sufficiently related to the crime for which Johnson was charged, and thus, the statement is admissible under the co-conspirator exception to the hearsay rule.

With these principles in mind, I join the majority opinion.

Justice NIGRO joins this concurring opinion.