J-S07008-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ROBERT R. TORRES, | |
| Appellant | No. 608 EDA 2017 |

Appeal from the PCRA Order Entered January 23, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0013710-2010

BEFORE: BENDER, P.J.E. , PANELLA, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED MAY 17, 2018**

Appellant, Robert R. Torres, appeals from the post-conviction court's January 23, 2017 order denying his first petition filed under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. Appellant raises nine claims of ineffective assistance of counsel (IAC). After careful review, we affirm.

This Court previously adopted the following summary of the facts of Appellant's case:

> On July 2, 2010, [Appellant] told Rene Ortiz Acevedo that someone had stolen crack cocaine from him. He then requested use of … Acevedo's vehicle so that they could go "take care of some problems." Prior to this occasion, [Appellant] had loaned money to … Acevedo to purchase this vehicle. Shortly after the request, … Acevedo picked up [Appellant] in his burgundy Jeep Cherokee from outside [Appellant's] apartment. The two men drove to a Chinese store on the corner near … Acevedo's apartment where they picked up Edilberto Cruz Castro and Darnell Watson. At that time [Appellant] was in the driver's seat, while

… Castro sat in the front passenger seat. … Acevedo and … Watson sat in the back passenger seats. About twenty minutes later, at approximately 8:53 p.m., the four (4) men arrived at 4th and Ashdale Streets, where they found Benjamin Tucker and his friend. The men believed that … Tucker was the person who had stolen drugs from [Appellant].

[Appellant] and … Watson remained seated while … Castro and … Acevedo exited the vehicle and approached … Tucker and his friend. … Acevedo tried to grab … Tucker in an effort to pull him into the vehicle, but … Tucker pushed him away. During the struggle, … Tucker's friend managed to escape. … Castro then pulled out a gun and shot … Tucker in the chest. After … Tucker fell to the ground, … Castro stood over the victim and shot him two more times. … Castro and … Acevedo then returned to the Jeep Cherokee, and the men drove away, turning left onto 4th Street. When they reached an alley, all four men abandoned the vehicle and ran away from the scene. On July 3, 2010, Detectives Thorsten Lucke and Tracy Byard recovered video surveillance footage from Elvis Grocery store located at 326 West Ashdale Street. The video displayed a confrontation that involved people who were in a dark colored SUV that arrived on location at 20:52:36 and left going eastbound on Ashdale Street at 20:53:10.

Police Officer Michelle Long responded to the crime scene immediately after the shooting and observed … Tucker lying on the ground. The victim displayed an obvious wound, and he was able to point to the side of his chest after being asked where he had been shot. The victim also indicated to Officer Long that he could not identify his assailant. Officer Long remained with the victim until rescue arrived.

At approximately 9:24 p.m., … Tucker was pronounced dead. Dr. Gary Collins, Deputy Chief Medical Examiner, conducted an autopsy of the victim and testified at trial as an expert in forensic pathology. Dr. Collins concluded to a reasonable degree of scientific and medical certainty that the cause of … Tucker's death was multiple gunshot wounds. … Tucker's injuries included a perforating gunshot wound to his chest. The bullet entered the right side of … Tucker's chest and exited the right side of his back. This bullet travelled through the chest, through the right atrium, through the right lung, and through the soft back muscle tissues before it exited … Tucker's body. In addition, … Tucker suffered a graze wound to his left shoulder, a superficial wound to his left cheek with a bullet fragment inside, and an abrasion on the right side of his flank. The graze wound and chest wound were inflicted by two separate bullets. The bullet fragment found in … Tucker's cheek appeared to have ricocheted into his skin. The bullet that pierced

through … Tucker's right atrium caused significant internal bleeding, causing the victim to bleed to death. Dr. Collins also concluded to a reasonable degree of scientific and medical certainty that the manner of … Tucker's death was homicide. Dr. Collins observed on … Tucker's body stippling marks, which indicate[d] that the gun was fired within one to three feet from the victim.

On July 3, 2010, at approximately 12:05 a.m., Police Officer William Trenwith responded to the crime scene and recovered two .40 caliber fired cartridge casings, one copper fragment and one lead fragment directly across the street from the 400 block of West Ashdale Street. In addition to retrieving ballistics evidence, Officer Trenwith also found a hat and sneakers. While at the crime scene, Officer Trenwith, then assigned to the Crime Scene Unit, took photographs, prepared a scaled sketch of the crime scene, and submitted a report.

Officer Trenwith submitted the ballistics evidence to the Firearms Identification Unit for examination. A latent fingerprint examination on the ballistics evidence was attempted, but no fingerprints were found. Police Officer Ernest Bottomer, an expert in firearms identification and ballistic evidence, examined the ballistics evidence and prepared a report. After examining the two .40 caliber fired cartridge casings, Officer Bottomer determined that they were both fired from the same firearm. He was unable to compare [the] same to a gun because one had not been submitted for examination. Officer Bottomer examined a lead bullet core and a bullet jacket and was unable to determine their exact caliber. Officer Bottomer was also unable to compare the uncoated lead fragment taken from the victim's left cheek to any other ballistics evidence because it was unsuitable for microscopic examination. At trial, Officer Bottomer explained that a .40 caliber semiautomatic travels about 900 to 950 feet per second when it leaves the gun barrel.

Officer Daniel Gilmore also responded to the original crime scene. While securing the scene, he was met by [two witnesses,] Dr. Juan Ignacio Espinoza and Michael Roseboro. At the direction of his sergeant, Officer Gilmore remained with Dr. Espinoza and Mr. Roseboro until the detectives could interview them. While they waited for detectives, Mr. Roseboro indicated that a vehicle was involved in the shooting. Dr. Espinoza told Officer Gilmore that he had witnessed the shooting as he was driving on 4th Street. He also saw the two perpetrators get back into a vehicle and flee the scene. Dr. Espinoza followed the vehicle and obtained the license plate. While chasing the vehicle, Dr. Espinoza called 911. After reporting the vehicle's license plate, Dr. Espinoza returned to the crime scene and found the victim drowning in blood. Dr.

Espinoza remained on the scene and waited for police to arrive. Dr. Espinoza informed Officer Gilmore that a burgundy Jeep Cherokee was involved in the shooting and gave him the license plate number that he had obtained.

Approximately five minutes after the shooting, Police Officer Brian Hilbert found the Jeep Cherokee in an abandoned lot at the corner of Front Street and Roosevelt Boulevard, approximately three blocks away from Ashdale Street. The driver door of the Jeep Cherokee was open and the motor was still running. Officer Gilmore drove Dr. Espinoza and Mr. Roseboro to view the Jeep Cherokee for identification purposes. About one hour after the shooting, Dr. Espinoza confirmed that the Jeep Cherokee was the vehicle involved in the shooting. The vehicle matched the description that he had provided to Officer Gilmore. After this identification was made, police photographed the vehicle and towed it to a garage.

When the Jeep Cherokee was processed, police found fingerprints of Letitia Marquez. On August 5, 2010, Letitia Marquez was interviewed. During this interview, she informed police that the Jeep belonged to her mother's boyfriend, Rene Ortiz Acevedo. After being shown a photograph of … Acevedo, she identified him as "Rico" and signed and dated the photograph. After interviewing Letitia Marquez, Detective Byard requested that her mother, Glorimar Marquez, be interviewed. On August 7, 2010, police interviewed Gloria Marquez. After being shown a photograph of … Acevedo, she identified him as "Rico" and signed and dated the photograph. During this interview, … Marquez was also shown photographs of [Appellant] and … Castro. She identified [Appellant] as "Memo" and … Castro as "Pella" and signed and dated each photograph.

Shortly after … Marquez's interview, … Acevedo surrendered himself to police. Before surrendering to police, [Appellant] tried to prevent him from doing so by offering to help … Acevedo obtain an attorney if needed. On August 10, 2010, … Acevedo provided a statement to police, which he signed and dated. During the interview, … Acevedo was shown a photograph of [Appellant], whom he identified as "Memo, Munchow." … Acevedo signed and dated the photograph. … Acevedo was also shown a photograph of … Castro, whom he identified as "Pella." He signed and dated the photograph. A follow up interview of … Acevedo was conducted by Detective Phillip Nordo on August 11, 2010. In his second statement to police, … Acevedo identified … Watson as the fourth person inside the car during the shooting. After being shown a photograph of … Watson, … Acevedo signed and dated the

photograph. Based on … Acevedo's interview, police brought … Watson in for questioning.

On August 10, 2010, Officer William Hunter, assigned to the District Attorney's Office, was working in plainclothes when he was assigned to search for [Appellant] and … Castro. Around 1:00 p.m., Officer Hunter saw [Appellant] driving a red pickup truck near 5th and Westmoreland Streets, one block away from 5th and Allegheny Streets. Officer Hunter exited his unmarked patrol car and walked toward [Appellant's] vehicle. At that time, Officer Hunter made eye contact with [Appellant], who immediately drove northbound on 5th Street at a high rate of speed. Officer Hunter followed the car and notified police radio of [Appellant's] flight. [Appellant] drove around the block and returned to 5th and Westmoreland Streets, where the vehicle was initially parked. Officer Hunter stopped the vehicle and found … Castro sitting in the passenger seat. Shortly thereafter, police transported [Appellant] and … Castro to the Homicide Unit.

On May 17, 2012, … Acevedo pled guilty to third-degree murder and criminal conspiracy to commit murder. He was offered a twelve and one-half (12 ½) to thirty (30) year prison sentence if he testified "truthfully and completely before any grand jury or any hearing or trial in this case in which the assistant district attorney requests him to testify." … Acevedo was also advised that he would be prosecuted for perjury if he made a false statement under oath. As a result of this plea agreement, … Acevedo testified against [Appellant] and … Castro.

In August 2010, … Watson met Edward Cameron, the assistant chief of the Homicide Unit in the District Attorney's Office and told him that he feared retaliation from these men because they were dangerous. Although Mr. Cameron explained the relocation program to … Watson, … Watson expressed no interest in being enrolled. On November 2, 2010, the Honorable Benjamin Lemer signed an order granting … Watson immunity in this case. … Watson was subpoenaed to testify as a Commonwealth witness at trial, but he failed to appear. As a result, this court determined that … Watson was unavailable and that [Appellant] had been provided a full and fair opportunity to cross-examine … Watson at the preliminary hearing. Consequently, the jury was able to consider … Watson's preliminary hearing testimony as substantive evidence.

*Commonwealth v. Torres*, No. 157 EDA 2013, unpublished memorandum at 1-6 (Pa. Super. filed Jan. 27, 2014) (quoting Trial Court Opinion, 5/15/13, at 2-9 (internal citations omitted)).

Based on this evidence, the jury convicted Appellant, and co-defendant Castro, of third-degree murder, carrying a firearm without a license, and carrying a firearm on a public street or property in Philadelphia. On August 3, 2012, Appellant was sentenced to an aggregate term of 26 to 52 years' incarceration. On January 27, 2014, this Court affirmed Appellant's judgment of sentence, after which our Supreme Court denied his subsequent petition for allowance of appeal. *See Commonwealth v. Torres*, 96 A.3d 1093 (Pa. Super. 2014), *appeal denied*, 99 A.3d 77 (Pa. 2014).

On December 24, 2014, Appellant filed a *pro se* PCRA petition. On February 29, 2016, privately retained counsel entered his appearance on Appellant's behalf. Counsel filed an amended petition on January 23, 2016. On December 5, 2016, the Commonwealth filed a motion to dismiss Appellant's petition, and on January 13, 2017, the PCRA court issued a Pa.R.Crim.P. 907 notice of its intent to do so. On February 6, 2017, Appellant filed a premature notice of appeal, as the PCRA court had not issued an order dismissing his petition at that point. On February 24, 2017, the court issued the order dismissing Appellant's petition; consequently, we will treat Appellant's premature notice of appeal as having been filed on that same day. *See* Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated

as filed after such entry and on the day thereof."). Appellant timely complied with the PCRA court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and the court issued a Rule 1925(a) opinion on October 18, 2017.

Herein, Appellant raises nine issues for our review:

1. INEFFECTIVE ASSISTANCE OF COUNSEL

A. ALL TRIAL COUNSEL RENDERED IN EFFECTIVE [*sic*] ASSISTANCE FOR FAILING TO OBJECT TO THE TESTIMONY INDICATING THAT APPELLANT HAD COMMITTED AN ACT OF RETALIATION[.]

B. APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE FOR FAILING TO RAISE TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE FOR FAILING TO CHALLENGE THE TRIAL COURT'S RULING WHICH DENIED TRIAL COUNSEL'S CROSS-EXAMINATION OF A CO-CONSPIRATOR REGARDING THE FACT THE HE POTENTIALLY FACED A LIFE SENTENCE WITHOUT THE AGREEMENT[.]

C. APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE ON DIRECT APPEAL THE DECISION BY THE TRIAL COURT TO PREVENT TRIAL COUNSEL FROM CROSS-EXAMINING THE WITNESS REGARDING HIS DENIAL THAT HE CONSPIRED TO COMMIT THE CRIME OF THIRD DEGREE MURDER EVEN AFTER HE PLED GUILTY TO THE SAME CHARGE THROUGH A COOPERATION AGREEMENT WITH THE COMMONWEALTH[.]

D. APPELLATE COUNSEL AS WELL AS TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO PROPERLY OBJECT AND PRESERVE THE ISSUE OF THE COMMONWEALTH'S PRESENTATION OF A WITNESS'[S] TESTIMONY THROUGH THE NOTES OF TESTIMONY AT THE PRELIMINARY HEARING WITHOUT CHALLENGING THE FULL AND FAIR OPPORTUNITY TO CROSS-EXAMINE THAT WITNESS AT THE PRELIMINARY HEARING[.]

E. APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE FOR FAILING TO ALLEGE TRIAL COUNSEL'S INEFFECTIVENESS FOR FAILING TO OBJECT TO HEARSAY TESTIMONY.

F. APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE FOR FAILING TO RAISE TRIAL COUNSEL'S INEFFECTIVENESS FOR FAILING TO OBJECT TO BAD CHARACTER TESTIMONY FROM A POLICE OFFICER REGARDING HIS KNOWLEDGE OF APPELLANT.

G. APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE FOR FAILING TO ALLEGE TRIAL COUNSEL'S INEFFECTIVENESS FOR FAILING TO SEEK REDACTION OF THE UNDULY PREJUDICIAL PRELIMINARY HEARING TESTIMONY[.]

H. APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE FOR FAILING TO RAISE ON DIRECT APPEAL TRIAL COUNSEL'S MOTION FOR A MISTRIAL BASED ON THE ADMISSION OF APPELLANT'S ARREST PHOTO[.]

I. APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE FOR FAILING TO RAISE THE ISSUE OF DARNELL WATSON'S REQUEST FOR RELOCATION BY THE DISTRICT ATTORNEY'S OFFICE[.]

Appellant's Brief at 10-11.

First, "[t]his Court's standard of review from the grant or denial of post-conviction relief is limited to examining whether the lower court's determination is supported by the evidence of record and whether it is free of legal error." **Commonwealth v. Morales**, 701 A.2d 516, 520 (Pa. 1997) (citing **Commonwealth v. Travaglia**, 661 A.2d 352, 356 n.4 (Pa. 1995)). Where, as here, a petitioner claims that he received ineffective assistance of counsel, our Supreme Court has directed that the following standards apply:

> [A] PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). "Counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him." [**Commonwealth v.**] **Colavita**, 606 Pa. [1,] 21, 993 A.2d [874,]

886 [(Pa. 2010)] (citing **Strickland**[ **v. Washington**, 104 S.Ct. 2053 (1984)]). In Pennsylvania, we have refined the **Strickland** performance and prejudice test into a three-part inquiry. **See** [**Commonwealth v.**] **Pierce**, [515 Pa. 153, 527 A.2d 973 (Pa. 1987)]. Thus, to prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result. **Commonwealth v. Ali**, 608 Pa. 71, 86, 10 A.3d 282, 291 (2010). "If a petitioner fails to prove any of these prongs, his claim fails." **Commonwealth v. Simpson**, [620] Pa. [60, 73], 66 A.3d 253, 260 (2013) (citation omitted). Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. **See Ali, supra**. Where matters of strategy and tactics are concerned, "[a] finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." **Colavita**, 606 Pa. at 21, 993 A.2d at 887 (quotation and quotation marks omitted). To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." **Commonwealth v. King**, 618 Pa. 405, 57 A.3d 607, 613 (2012) (quotation, quotation marks, and citation omitted). "'[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.'" **Ali**, 608 Pa. at 86–87, 10 A.3d at 291 (quoting **Commonwealth v. Collins**, 598 Pa. 397, 957 A.2d 237, 244 (2008) (citing **Strickland**, 466 U.S. at 694, 104 S.Ct. 2052)).

**Commonwealth v. Spotz**, 84 A.3d 294, 311-12 (Pa. 2014).

In Appellant's first issue, he claims that counsel was ineffective for not objecting to the following testimony elicited from Rene Ortiz Acevedo during direct-examination:

[The Commonwealth:] And why did you decide to turn yourself in?

[Acevedo:] I was afraid that something will happen to me.

[The Commonwealth:] What do you mean by that?

[Acevedo:] I want nothing to happen to me.

[The Commonwealth:] From whom?

[Acevedo:] [Castro] and [Appellant].

[The Commonwealth:] Were you afraid of them?

[Acevedo:] Yes.

[The Commonwealth:] Why were you afraid of them?

[Acevedo:] Because of what happened.

N.T. Trial, 5/30/12, at 21.

Appellant argues this testimony was inadmissible evidence of prior bad acts, specifically that he and/or Castro had directly or indirectly threatened Acevedo. Appellant also claims that Acevedo's testimony raised an "unduly suggestive" inference "that Appellant and co-defendant [Castro] had planned the murder." Appellant's Brief at 18. According to Appellant, such an inference was purely speculative where there was no other evidence "that Appellant had any awareness that [] co-defendant [Castro] was going to shoot the decedent." *Id.* Appellant avers that trial counsel's failure to object to this testimony by Acevedo, and move for a mistrial, "left the jury with the clear impression that Appellant not only contemplated the murder beforehand, but attempted to intimidate [Acevedo] so that he would not cooperate with the police against Appellant and [Castro]." *Id.* at 19.

Appellant's argument is unconvincing. Acevedo did not testify that his fear stemmed from a threat by Appellant or Castro; instead, Acevedo testified he was afraid of Castro and Appellant *because of the victim's murder*. Moreover, on cross-examination by Appellant's counsel, Acevedo explicitly

was asked whether Appellant or Castro had ever threatened him, and he responded, "[n]o[,]" and testified that he turned himself in because the police were looking for him. N.T. Trial, 5/30/12, at 73.

To the extent that Acevedo's testimony suggested that Appellant and Castro planned that murder, Appellant does not explain why such an inference was impermissible. Indeed, the Commonwealth called Acevedo to the stand for the precise purpose of explaining how the murder occurred, and who was involved in its planning and commission. Being that Acevedo was an eyewitness to, and participant in, the victim's killing, we ascertain nothing improper about his testimony describing the crime, or his stating that he feared Appellant and Castro in light of the murder. Therefore, there was no basis on which trial counsel could have objected to Acevedo's above-quoted testimony, and Appellant's first ineffectiveness claim fails.

In Appellant's second IAC claim, he contends that his appellate counsel erred by not arguing that the trial court abused its discretion by limiting the cross-examination of Acevedo regarding the sentence he was promised in exchange for his testifying against Appellant and Castro. In particular, Appellant takes issue with the following portion of Castro's counsel's cross-examination of Acevedo:

> [Castro's Counsel:] Who is it that is going to recommend the sentence of 12-and-a-half to 30 years for you to this particular judge?
>
> [Acevedo:] I don't know.
>
> [Castro's Counsel:] No idea?

- 11 -

[Acevedo:] No.

[Castro's Counsel:] How about [the Commonwealth's attorney, Mr. Lipscomb]?

…

Correct?

[Acevedo:] Yes.

[Castro's Counsel:] Before you were looking at 12-and-a-half to 30 years in prison, what were you looking at before you cut your deal?

[Acevedo:] Forty to 80.

[Castro's Counsel:] Really. What happens if you had gone to trial and been convicted of first-degree murder?

[Acevedo:] I guess I would be guilty.

[Castro's Counsel:] Life in prison without parole, correct?

[The Commonwealth:] Objection.

[The Court:] Sustained.

N.T. Trial, 5/30/12, at 45-46.

Appellant now contends that his trial counsel "rendered ineffective assistance for failing to challenge the trial court's ruling" that Acevedo could not testify about the maximum penalty he faced if convicted of first-degree murder. Appellant's Brief at 26. In regard to how, exactly, trial counsel should have handled this matter, Appellant only generally remarks that counsel should have "attempt[ed] to further cross-examine, or place on the record a challenge to the trial court's decision to arbitrarily cut off cross-examination regarding the powerful motive for this witness to lie." *Id.* Appellant also

cursorily claims, without any discussion, that, "appellate counsel was ineffective for failing to raise this issue on direct appeal." *Id.*

Appellant's underdeveloped argument does not convince us that his trial counsel, or appellate attorney, acted ineffectively. More specifically, he has not demonstrated that he was prejudiced by either attorney's conduct. As the PCRA court reasons:

> Here, Acevedo agreed to testify against [Appellant] and Castro in exchange for a lower sentence than what he originally faced. There was no violation of [Appellant's] Sixth Amendment right to confront an adverse witness because this court did not prevent trial counsel from cross-examining the witness on this issue. Indeed, the jury was informed that Acevedo faced a lower sentence because of his plea agreement. This court denied cross-examination which would have revealed that [Appellant] faced a mandatory sentence of life in prison without the possibility of parole if convicted of first[-]degree murder, which is something a jury is not permitted to consider in their deliberations. *Commonwealth v. Carbaugh*, 620 A.2d 1169, 1171 (Pa. Super. 1993) (stating that the "jury is not to know or to consider sentences when deliberating"). [Appellant] was able to pursue appropriate cross-examination of the witness which revealed that he negotiated a more favorable sentence in exchange for his testimony. Thus, [Appellant] was not prejudiced by trial counsel's failure to challenge this court's ruling, and appellate counsel cannot be ineffective for failing to make a meritless claim on direct appeal.

PCRA Court Opinion (PCO), 10/18/17, at 12-13. For the reasons stated by the PCRA court, Appellant's second ineffectiveness claim fails.

In Appellant's third IAC issue, he argues that his appellate counsel was ineffective for not challenging the trial court's decision to prevent Castro's counsel from eliciting certain testimony from Acevedo on cross-examination.

Specifically, Appellant points to the following testimony and ruling by the court:

> [Castro's Counsel:] Okay. When you got in the car, did you see anybody with a gun before you got out at 4th and Ashdale?
>
> [Acevedo:] No.
>
> [Castro's Counsel:] Nobody talked about a gun or killing anybody?
>
> [Acevedo:] No.
>
> [Castro's Counsel:] And, in fact, your testimony was, on the ride up there, all you did was listen to music?
>
> [Acevedo:] Yes.
>
> [Castro's Counsel:] You certainly didn't go there agreeing to kill somebody, did you?
>
> [Acevedo:] No.
>
> [Castro's Counsel:] You didn't go there intending to kill anybody, did you?
>
> [Acevedo:] No.
>
> [Castro's Counsel:] So explain to the jury why you pled guilty in front of this judge to conspiracy and to murder?
>
> [The Commonwealth:] Objection.
>
> [The Court:] Overruled.
>
> [Acevedo:] Because I was with them. That's conspiracy.
>
> [Castro's Counsel:] **That's what a conspiracy is? Just because you were present?**
>
> [The Commonwealth:] Objection.
>
> [The Court:] That's sustained.

N.T. Trial, 5/30/12, at 51-52 (emphasis added).

Appellant contends that Castro's counsel's above-emphasized question was "a proper one[,]" in that it was "an attempt to explore the contradiction

- 14 -

between [Acevedo's] agreement to plead guilty and his testimony that he was not part of any conspiracy." Appellant's Brief at 28. According to Appellant, "[t]his question goes directly to [Acevedo's] credibility" and "to the heart of Appellant's defense … that Appellant … was not involved in any conspiracy to commit murder, but rather he was merely present at the scene." *Id.* Thus, Appellant avers that the trial court erred by not permitting this questioning of Acevedo, and "[t]here was no rational explanation for the failure of [a]ppellate counsel to raise this issue on direct appeal." *Id.* at 29.

In rejecting this claim, the PCRA court concluded that it had "properly sustained the objection [to Castro's counsel's above-emphasized question] as improper cross-examination of a lay witness about the legal definition of conspiracy. Thus, there was no basis for [appellate] counsel to challenge this court's ruling." PCO at 14. We agree with the PCRA court. Castro's counsel's phrasing of the at-issue question called for "specialized knowledge beyond that possessed by a lay person[,]" namely, knowledge of the legal definition of criminal conspiracy. Pa.R.E. 702(a) (stating what testimony may be offered by an expert witness). While a lay witness may testify in the form of an opinion if it is "rationally based on the witness's perception[,]" Castro's counsel's question of Acevedo did not call for such an opinion. Instead, the PCRA court concluded that the question essentially would elicit an expert opinion by Acevedo, a lay witness. We discern no error in the PCRA court's decision. Thus, Appellant has failed to demonstrate that his underlying claim of ineffectiveness has arguable merit.

In Appellant's fourth issue, he asserts that his appellate counsel acted ineffectively by not challenging on appeal the fact that the trial court permitted the Commonwealth to introduce the transcript of the preliminary hearing testimony of an unavailable witness, Darnell Watson. Appellant acknowledges that appellate counsel did challenge the admission of the transcript of Watson's testimony on the ground that Watson was not truly 'unavailable' to testify at trial. However, Appellant argues that appellate counsel should have also raised a claim that Appellant did not have a full and fair opportunity to cross-examine Watson at the preliminary hearing and, thus, the transcript of his prior testimony should not have been admitted. Specifically, Appellant contends:

> The testimony of Darnell Watson, offered through the notes of the preliminary hearing, deprived trial counsel the opportunity to fully explore through cross-examination the witness'[s] motive to fabricate, [and the] opportunity to change that story over the course of time. This area of inquiry was crucial as the witness faced increased scrutiny by the homicide detectives and prosecutors, which included the ability to confront the witness with his prior record. Appellate counsel failed to raise this part of the issue addressed by trial counsel. The failure to provide a full and fair opportunity to cross-examine the witness was clear on the record, and therefore, there was no explanation as to appellate [counsel's] decision not to raise it on direct appeal. While appellate counsel raised the question regarding the Commonwealth's lack of proof regarding Watson's unavailability, the more compelling argument to exclude this evidence[] was the failure of Appellant's counsel to have a full and fair opportunity to cross-examine Watson during the preliminary hearing without access to the statements, including a videotaped statement taken from Watson months later. Without the ability to confront the witness with these very significant pieces of information, Appellant was deprived of his Sixth Amendment right to cross-examine Watson at the preliminary hearing regarding the subsequent

statements made to homicide. Appellant's trial counsel was not able to explore the content, as well as the context of these subsequent statements. The decision to admit the notes of testimony deprived Appellant [of] a fair trial, and appellate counsel can offer no rational explanation [for failing] to raise this on direct appeal.

Appellant's Brief at 32-33.

In addressing Appellant's argument, we begin by noting that,

[u]nder both our federal and state constitutions, a criminal defendant has the right to confront and cross-examine witnesses against him at trial. ***Commonwealth v. Bazemore***, 531 Pa. 582, 585, 614 A.2d 684, 685 (1992) (citations omitted). However, it is well-established that an unavailable witness' prior recorded testimony from a preliminary hearing is admissible at trial and will not offend the right of confrontation, provided the criminal defendant had counsel and *a full opportunity to cross-examine that witness at the prior proceeding. **Id.*** 614 A.2d at 687 (citation omitted) (emphasis added). The exception to the hearsay rule that permits the admissions of an unavailable witness' prior testimony at a preliminary hearing is "predicated on the 'indicia of reliability' normally afforded by adequate cross-examination. But where that 'indicia of reliability' is lacking, the exception is no longer applicable." ***Id.*** 614 A.2d at 687 (citations omitted). The Commonwealth may not be deprived of its ability to present inculpatory evidence at trial merely because the defendant, despite having the opportunity to do so, did not cross-examine the witness at the preliminary hearing stage as extensively as he might have done at trial. ***Commonwealth v. Cruz-Centeno***, 447 Pa. Super. 98, 668 A.2d 536, 542 (1995) (citation omitted). However, where the defense, at the time of the preliminary hearing, was denied access to vital impeachment evidence, a full and fair opportunity to cross-examine the unavailable witness may be deemed to have been lacking at the preliminary hearing. ***Id.***, 668 A.2d at 543 (citing ***Bazemore, supra***). The opportunity to impeach a witness is particularly important where the Commonwealth's entire case hinges upon the testimony of the unavailable witness. ***Commonwealth v. Smith***, 436 Pa. Super. 277, 647 A.2d 907, 913 (1994) (citing ***Bazemore, supra***).

*Commonwealth v. Johnson*, 758 A.2d 166, 169 (Pa. Super. 2000) (emphasis in original).

Appellant's argument fails to convince us that his appellate counsel acted ineffectively by not arguing that Appellant did not have the opportunity to conduct a full and fair cross-examination of Watson. Initially, we note that Watson's preliminary hearing testimony was merely cumulative of Acevedo's trial testimony in this case. Thus, Watson's testimony was not central to the Commonwealth's prosecution, as in *Bazemore*, one of the cases on which Appellant relies.

In any event, Appellant's claim fails because he does not explain what, specifically, Watson said in the out-of-court statements to police that Appellant's trial counsel could have utilized in cross-examining Watson. Indeed, Appellant does not even make a general allegation that the statements were inconsistent with Watson's preliminary hearing testimony. The same is true for Appellant's bald reference to Watson's prior record; Appellant does not say whether Watson's prior crimes included *crimen falsi* offenses that could have been used to impeach Watson's credibility. Thus, unlike the cases on which Appellant relies, *Bazemore* and *Johnson*, we cannot determine that Appellant's trial counsel could have used Watson's statements to police, or his prior record, to more fully cross-examine Watson at the preliminary hearing. Accordingly, Appellant has not established that he was prejudiced by appellate counsel's failure to argue on direct appeal that Appellant was deprived of a full and fair opportunity to cross-examine Watson.

In Appellant's next issue, he avers that his trial counsel was ineffective for failing to object to hearsay testimony offered by Glorimar Marquez, who was Acevedo's girlfriend at the time of the murder. First, Appellant claims that trial counsel should have objected to certain testimony offered by Marquez, which he reproduces in his appellate brief, as follows:

> [The Commonwealth]: When they came back, he did not have the Jeep?
>
> Ms. Marquez: Yes.
>
> [The Commonwealth]: Did you ask what happened to the Jeep?
>
> Ms. Marquez: Yes.
>
> [The Commonwealth]: He said that they left it over there. A couple of days later, a day, they all got together and they drove somewhere and I don't know they took the Jeep over there I guess.

Appellant's Brief at 34-35.

Appellant provides no citation to where in the record this testimony was offered. *See id.* at 35. While our review of the record reveals testimony by Marquez that is *similar* to that quoted *supra*, no testimony by Marquez exactly aligns with that set forth in Appellant's brief. Additionally, Appellant seems to omit portions of her testimony, and questions by the Commonwealth, without indicating that he is doing so, rendering his representation of the record incomplete and misleading.

We also find Appellant's argument that his counsel acted ineffectively by not objecting to this purported testimony to be unconvincing. Although Appellant briefly argues that Marquez's testimony was "classic hearsay and

- 19 -

not within the scope of any exception to the hearsay rule[,]" *id.*, he provides no discussion of how this specific testimony prejudiced him. Instead, Appellant seemingly suggests that the above-testimony was only prejudicial due to the following, subsequent testimony that was elicited from Ms. Marquez on direct-examination:[1]

> [Ms. Marquez:] Okay. [Rene Ortiz Acevedo] said [that] when they all left in the van, they started driving. They went up to this guy. They took him, supposedly met Pella and the black guy was roughing and fighting or whatever. And Pella took the gun and emptied the whole clip on him.
>
> [The Commonwealth:] That's what [Acevedo] told you?
>
> [Ms. Marquez:] Yes.
>
> [The Commonwealth:] And you recall, did he tell you that [*sic*] this was over?
>
> [Ms. Marquez:] Yes.
>
> [The Commonwealth:] What did he say?
>
> [Ms. Marquez:] Over drugs.
>
> [The Commonwealth:] Was he more specific than that?
>
> [Ms. Marquez:] No. He said it was just over drugs that was, I guess, owed or stolen.
>
> [Appellant's Counsel]: Objection, Your Honor.
>
> [Castro's Counsel]: Objection, Your Honor.
>
> THE COURT: Overruled, go on.
>
> [The Commonwealth:] They were owed or stolen?

---

[1] Again, Appellant does not accurately quote Marquez's testimony in his brief to this Court. However, he provides a citation to the record where the disputed testimony can be found; thus, we reproduce it as it appears in the transcript, rather than as Appellant presents it in his appellate brief.

[Ms. Marquez:] Yes.

[The Commonwealth:] Did he say by whom they were stolen?

[Ms. Marquez:] He didn't say no name, but he did say it was the black guy.

[The Commonwealth:] Who had stolen the drugs?

[Ms. Marquez:] Yes.

[The Commonwealth:] Did he say who the drugs had been stolen from?

[Ms. Marquez:] He just said from the corner.

[The Commonwealth:] Was he more specific about whose corner it was?

[Appellant's Counsel:] Objection.

[Castro's Counsel:] Objection.

THE COURT: Overruled.

[The Commonwealth:] Was he more specific about whose corner it was?

[Ms. Marquez:] Yes.

[The Commonwealth:] Whose corner?

[Ms. Marquez:] He said Memo's.

N.T. Trial, 5/31/12, at 102-04.

Appellant now contends that "[n]one of the testimony set forth above should have been admitted" because it was hearsay that does not meet any exception to the rule precluding hearsay. Appellant's Brief at 36. However, Appellant fails to acknowledge that, during the examination of Marquez, Appellant's trial counsel, and Castro's counsel, **_twice objected_**, once to an answer by Marquez, and once to a question asked by the Commonwealth.

Appellant does not explain what more trial counsel should have done to keep the jury from considering Marquez's at-issue statements.

In any event, we agree with the PCRA court that Appellant has not demonstrated that he was prejudiced by the admission of Marquez's testimony. As the court explains:

> There can be no prejudice for failure to object to hearsay testimony when the testimony was "merely cumulative of other, properly admitted testimony." **Commonwealth v. Wallace**, 724 A.2d 916, 922 (Pa. 1999); **see also Commonwealth v. Johnson**, 838 A.2d 663, 673-74 (Pa. 2003) (stating that admission of hearsay evidence is harmless when it is cumulative of other evidence).
>
> [Appellant] claims that Marquez's testimony about what Acevedo told her about the shooting and the stolen drugs was hearsay. However, this testimony was merely cumulative of testimony from Darnell Watson and Rene Ortiz Acevedo that was properly admitted. Specifically, Marquez's testimony was cumulative of Acevedo's testimony about what happened the night of the murder, and he testified that he told Marquez about it. Under these circumstances, trial counsel was not ineffective for failing to object to the testimony….

PCO at 15-16. Appellant offers no argument to challenge the PCRA court's determination that he failed to prove prejudice. As the record supports that determination, we reject Appellant's fifth ineffectiveness claim.

In Appellant's sixth issue, he maintains that his trial counsel was ineffective for failing to object to testimony by Police Officer William Hunter, who stated that he knew Appellant by his nickname, "Memo," and that he knew where Appellant could be found. **See** Appellant's Brief at 40, 41. Although Appellant recognizes that the officer also testified that he did not know Appellant because he had arrested him "or anything like that[,]"

Appellant claims that Officer Hunter's testimony improperly inferred that the officer "knew Appellant through his police work." *Id.* at 41 (quoting N.T. Trial, 5/31/12, at 155). In other words, Appellant asserts that Officer Hunter's testimony constituted improper evidence of Appellant's prior criminal activity and, thus, it should have been objected to by trial counsel.

In rejecting this claim, the PCRA court reasoned as follows:

> [S]imply because a police officer testified about knowing [Appellant], [it] does not imply prior criminal activity or bad character. The Superior Court has stated:
>
> > Merely because a police officer knows someone or knows where they may be found does not suggest that the person has been engaged in prior criminal activity. A policeman may know someone because they reside in the same neighborhood or for any number of reasons. We refuse to hold that a policeman's statement to the effect that he knew someone, knew his nickname, or was familiar with the person's whereabouts raises an inference of prior criminal activity.
>
> *Commonwealth v. Sanders*, 442 A.2d 817, 818 (Pa. Super. 1982).
>
> Officer Hunter, who grew up in that neighborhood and had been assigned there for many years[,] testified that he knew [Appellant's] nickname and where he could be found. He also testified that he did not know the nickname because of a previous arrest or prior criminal conduct. Thus, an objection to his testimony would have been meritless, and counsel cannot be ineffective for failing to raise a meritless claim. *See Commonwealth v. Riggins*, 386 A.2d 520, 524 (Pa. 1978).

PCO at 16.

Again, Appellant does not challenge the PCRA court's decision, nor make any attempt to distinguish Officer Hunter's testimony from the type of testimony addressed in *Sanders*. After reviewing that case, we agree with

- 23 -

the PCRA court that Officer Hunter's testimony did not constitute 'prior bad acts' evidence, as Appellant claims. Accordingly, Appellant's trial counsel was not ineffective for failing to object to the officer's testimony on this basis.

Next, Appellant claims that certain portions of Darnell Watson's preliminary hearing testimony, once admitted into evidence at trial, should have been redacted. In particular, Appellant takes issue with Watson's testimony that, in the car just prior to the murder, Appellant and/or Castro were talking on the telephone to an unidentified woman about her selling drugs, and about who stole the drugs from Appellant. According to Appellant, this inadmissible hearsay testimony demonstrated "that Appellant and this unknown woman were engaged in a drug conspiracy and that … Appellant's drugs were stolen…." Appellant's Brief at 44. Appellant avers that trial counsel should have requested that this portion of Watson's testimony be redacted, and counsel's failure to do so "was clearly prejudicial as it deprived Appellant of a fair trial." *Id.* at 45.

We conclude that Appellant has not demonstrated that he was prejudiced by counsel's decision not to request the redaction of this portion of Watson's preliminary hearing testimony. The at-issue testimony was brief, and to the extent that Watson mentioned drugs being stolen from Appellant, that testimony was clearly cumulative of Acevedo's trial testimony. *See* N.T. Trial, 5/30/12, at 11. Additionally, a close reading of the disputed portion of Watson's testimony reveals that Watson said *Acevedo*, not Appellant, was talking on the phone with the unidentified woman. *See* N.T. Trial, 6/1/12, at

23 (Watson's stating that "Ortiz," *i.e.*, Acevedo, got the phone call from the woman). Thus, Watson's passing remarks about Acevedo's telephone conversation with an unidentified woman were merely cumulative of Acevedo's properly admitted testimony, and did not prejudice Appellant.

In Appellant's eighth IAC claim, he argues that the jury was improperly shown arrest photographs of Appellant, which, "in conjunction with the other bad character evidence admitted during the course of the trial," unfairly prejudiced Appellant and warrants a new trial. Appellant's Brief at 49. Initially, we note that Appellant fails to clarify whether he is challenging trial counsel's representation, or that of his appellate attorney. For instance, he states the issue as a challenge to appellate counsel's representation, **see id.** at 45, yet his argument focuses entirely on trial counsel's handling of the admission of the photographs. Appellant also confusingly states that his "[t]rial counsel properly moved for a mistrial" when the photographs were "published to the jury," but then later claims that, "[t]rial counsel's failure to object to this evidence amounted to ineffective assistance which prejudiced Appellant…." **Id.** at 48, 49.

Our review of the record reveals that trial counsel did object to the admission of the photographs, and moved for a mistrial, on the basis that they impermissibly suggested to the jury that Appellant "was arrested before." N.T. Trial, 6/1/12, at 167-72. The court denied the motion for a mistrial. **Id.** at 175. Therefore, Appellant's claim that trial counsel acted ineffectively is belied by the record. To the extent that Appellant baldly avers that appellate

counsel was ineffective, we reject that assertion, as Appellant has presented no meaningful discussion to support it.[2]

Appellant's ninth and final ineffectiveness issue involves the following testimony by Detective Byard, elicited during cross-examination by Castro's attorney:

> [Castro's Counsel:] Where did [Darnell Watson] go [after giving a statement to police]?
>
> [Detective Byard:] We called the Warrant Unit to see if they wanted him. They told us to give him another date. We did.
>
> He went over to see [Assistant District Attorney (A.D.A.)] Cameron to talk to him because **he wanted to be relocated**, and once he talked to A.D.A. Cameron, then he was released.

---

[2] We also note that Appellant wholly disregards the PCRA court's rationale for rejecting this claim, which was that "the photographs shown to the jury were of [Appellant's] tattoos and birthmark. There was no indication the photographs were mug shots or from an arrest. There was no prejudice because the jury could not have reasonably inferred the photographs indicated [Appellant] had engaged in prior criminal activity." PCO at 17. Appellant in no way challenges the court's characterization of the photographs on appeal. Instead, he merely argues that the only conclusion the jury could draw from these 'arrest photos' was that he had a prior record, given the other evidence suggesting the same - namely, "Officer Hunter's testimony that he knew Appellant from a particular corner prior to his arrest in this case…." Appellant's Brief at 48. However, as discussed *supra*, Officer Hunter's testimony did not improperly suggest that Appellant had a criminal history, and the officer even explicitly stated that his knowledge of Appellant did not stem from any arrest. *See* N.T. Trial, 5/31/12, at 155. As such, we reject Appellant's claim that "the only conclusion" the jury could draw from the photographs of his tattoos and birthmark, in conjunction with Officer Hunter's testimony, was that he had previously been arrested. Appellant's Brief at 47.

N.T. Trial, 6/1/12, at 138-39 (emphasis added). Appellant's counsel did not object to this testimony. However, at the close of Detective Byard's testimony, and outside the presence of the jury, Appellant's counsel objected to the above-emphasized comment, asking that the testimony be stricken, or a mistrial be granted. *Id.* at 161-62. The trial court denied those requests. *Id.* at 163-66.

Now, Appellant contends that Detective Byard's remark was "completely inadmissible[,]" and that it left the jury with the "impression … that Watson's unavailability was the result of his fear of Appellant." Appellant's Brief at 50. However, Appellant's argument regarding counsel's ineffectiveness is once again confusing. For instance, while Appellant recognizes that trial counsel objected to the detective's testimony and moved for a mistrial, he then contradicts himself by stating that, "[t]here was no rational basis for trial counsel's failure to redact this hearsay testimony." *Id.* at 51. Additionally, Appellant presents the issue as a challenge to ***appellate*** counsel's representation, yet he offers no discussion of why appellate counsel erred by not raising, on direct appeal, a claim that the trial court erred by not granting the relief requested by trial counsel.

From our review of the record, it is apparent that trial counsel acted effectively by challenging the at-issue testimony, requesting it be stricken, and moving for a mistrial. To the extent that appellate counsel chose not to raise this issue on direct appeal, Appellant has not developed any meaningful

argument to demonstrate that counsel's decision amounted to ineffective representation.[3]   Therefore, Appellant's final issue is meritless.

In sum, none of Appellant's nine ineffectiveness claims warrants relief. Consequently, the PCRA court did not err in denying his petition.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/17/18

---

[3] We also note our agreement with the PCRA court that "[n]othing in the trial record could lead a reasonable juror to conclude that [Appellant] had threatened Watson." PCO at 17.  Moreover, Detective Byard's remark about Watson's desire to be relocated was isolated and brief and, as the PCRA court stresses, "[t]he evidence against [Appellant] was overwhelming…." *Id.*  Thus, we agree with the PCRA court that Appellant has not demonstrated "the prejudice standard articulated in *Strickland, supra*." *Id.* at 18.