J-A11032-25

2025 PA SUPER 139

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CARLOS MONTALVO-RIVERA | : | |
| | : | |
| Appellant | : | No. 977 MDA 2023 |

Appeal from the Judgment of Sentence Entered June 21, 2023
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0000756-2020

BEFORE: MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED: JULY 9, 2025**

Appellant, Carlos Montalvo-Rivera, appeals from the judgment of sentence entered June 21, 2023, by the Lancaster County Court of Common Pleas following trial by jury and subsequent conviction. After careful review, we affirm.

On February 24, 2020, by filing of a Criminal Information Appellant was charged with: one count Criminal Homicide[1]; one count Arson with danger of death or bodily injury[2]; three counts of Criminal Attempt – Criminal Homicide[3]; and one count of Causing a Catastrophe[4]. The matter proceeded to trial by jury on March 20, 2023. Appellant was convicted on April 6, 2023, of Murder

---

[*] Former Justice specially assigned to the Superior Court.
[1] 18 Pa.C.S.A. § 2501(A)
[2] 18 Pa.C.S.A. § 3301(A)
[3] 18 Pa.C.S.A. §901, §2501
[4] 18 Pa.C.S.A. §3302(A)

in the First Degree, found guilty on all remaining counts, and subsequently was sentenced to life in prison for First Degree Murder, plus twenty to forty years' incarceration. He timely filed his notice of appeal on July 7, 2023.

At trial, the jury found that the Commonwealth proved beyond a reasonable doubt that in the early morning hours of December 6, 2010, Appellant set fire to his residence, one of a row of attached homes located at 14 North Plum Street, Lancaster Pennsylvania, with his wife and three children inside. This fire resulted in serious bodily injury to his two daughters, and the death of his wife Olga Sanchez. N.T. at 261.

The Commonwealth proceeded on the theory that these events were the culmination of an escalating pattern of abusive and threatening behavior from Appellant directed towards his wife, Ms. Sanchez, and in support thereof, adduced testimony from several witnesses establishing that Appellant had previously threatened to kill Ms. Sanchez. The victim's older brother, Julian Sanchez, testified that on one occasion he heard Appellant tell the victim "he was going to kill her like a bitch." N.T. at 1037. The victim's sister, Dolores Ojeda, testified that on a separate occasion, the Appellant confirmed to her that he had threatened to kill the victim "like a dog." N.T. at 1291-1292. A third witness, the victim's close personal friend, Rosaura Reyes, confirmed that she had been confronted by Appellant about yet another past death threat he made towards the victim, wherein Appellant pointed a gun at her. N.T. at 1263. Ms. Reyes confirmed that the victim had told her about this incident

prior to her death; in response to this, Appellant denied that the incident had ever occurred, and said "unfortunately Olga [is] dead and she was the only one who could say otherwise." *Id.* Ms. Reyes also confirmed that the victim had been having an affair with another man. N.T. 1258.

After the fire, the victim's body was found on her back, on the floor in her bedroom near where the fire had originated. The forensic medical examiner, Dr. Wayne Ross, observed the body at the scene and subsequently performed the autopsy. He noted that Ms. Sanchez' tongue was protruding from her mouth and dented with teeth marks, and he found that she had suffered a brain herniation, which, taken together, indicated pre-mortem strangulation resulting in a loss of consciousness. N.T. 1415-1419. Further, the doctor found isopropyl alcohol, an accelerant, in the victim's lungs, indicating that the accelerant was poured down her throat. *Id.* The doctor also found soot in the victim's airway. *Id.* at 1417-1418. Blood testing revealed that the victim's carbon monoxide level was elevated, but still relatively low at 9.5%, which indicated to the doctor that the victim was alive when she fire was set, as she had inhaled some smoke, but died almost immediately thereafter. *Id.*

At the scene, Dr. Ross completed a "sex kit;" in so doing he took swabs of the victim's oral, vaginal, and rectal regions. *Id.* at 1413. Subsequent testing of those samples showed the presence of sperm in the vaginal swabs, and semen, but no sperm, in the rectal swabs. *Id.* at 1419-1420. In interpreting

those findings, and his observations made at the scene, the doctor opined as follows:

> "A: [] There were sperm identified [] in the vaginal region, which indicates that there was penetration. But there was only semen identified in the rectal region. No sperm were identified by serology and during serology testing. So that is consistent with the fact she was found lying on her back, even though she's [] on her back, she's incapacitated due to the neck compression and everything else, she's still breathing. But ultimately, if she's lying there, the fluids from her vaginal region seeped out and drained down into her anal rectal region. So that is compatible [] with contamination. I considered the fact, would the anal rectal region represent separate penetration? I considered that, but it's most consistent in my mind, the fact is that we're dealing with contamination; that is, there was previous sexual penetration and then the fluids flow down due to [gravitational] forces while she's lying on her back and the fluids drained down into her anal rectal region. I didn't see any evidence of recent penetration in that area. If there were recent penetration, I would see dilatation; that is, the anal rectal region would have a larger hole, and I didn't see any evidence of that.
>
> Q. In other words, recent sexual activity but then never had stood back up after that activity, --
>
> A. Right."

*Id.* at 1419-1420 (cleaned up).

The contents of the swabs taken from Ms. Sanchz' body were subjected to DNA testing and compared with a sample taken from Appellant; the results of that testing were the subject of a stipulation by the parties indicating that the samples were several quintillion times more likely to have originated from the victim and the Appellant than from any other individuals. *Id.* at 1402-1403.

Dr. Ross determined the cause of death to have been a combination of thermal burns and suffocation from strangulation and smoke inhalation. *Id.* at 1415-1419.

At the time the fire was set, Appellant's son and two daughters were asleep in a bedroom on the third floor of the residence. They were awoken by the smoke alarm and thus were able to escape through a window on the third floor, the stairs having been blocked by the fire. While all three children survived, the youngest child sustained substantial bodily injuries after jumping from the roof of the residence onto the ground three stories below, and the middle child suffered severe burns on a large percentage of her body before being pulled out through the window onto the roof of the residence by her older brother and ultimately escaping with the assistance of a neighbor through an attached home.

Appellant raises seven questions for this Court's consideration:

1. Was the evidence sufficient as a matter of law to support Appellant's conviction?

2. Was it an error of the court to admit the testimony of Officer Greathouse concerning Kasey Winn?

3. Was it an error of the court to allow Detective Bonilla to testify as an expert in cultural linguistics without proper pre-trial notice under Rule 573; or, in the alternative, to admit Detective Bonilla as an expert at all?

4. Was it an error of the court to admit the testimony of Julian Sanchez concerning Appellant's prior threatening statements concerning his wife?

5. Was it an error of the court to admit the testimony of Rosaura Reyes concerning Appellant's prior threatening statements and actions?

6. Was it an error of the court to admit the testimony of Dolores Ojeda concerning a domestic conflict between appellant and his wife one year before the alleged arson; or, in the alternative, was Ms. Ojeda's testimony improperly admitted hearsay?

7. Was it an error of the court to allow Detective Nickel to provide lay testimony on the meaning and effect of cellphone records?

Appellant's Brief at 9.

In Appellant's first issue, he contends that the evidence in this case was insufficient to prove that he was the individual responsible for setting the December 6, 2010, fire that led to the death of his wife and served as the basis for all charges of which he was convicted. As Appellant has limited his challenge to the Commonwealth's evidence concerning the identity of the perpetrator, our scope of review is likewise narrowed.

We begin by setting forth our standard of review for assessing a sufficiency of the evidence claim; in doing so we determine:

> "[W]hether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to enable the fact[-]finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt.
>
> *
>
> In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability

of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.... Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

\*

These principles apply to a challenge to the sufficiency of the evidence offered to identify a defendant as the perpetrator of the alleged crime."

*Commonwealth v. Pledger*, 332 A.3d 29, 34 (Pa. Super. 2025)(internal citations omitted).

We find the assessment of the trial court on this matter to be soundly reasoned and well-supported by the record. As noted by the lower court: "there is substantial evidence that a fire was actively lit at 14 North Plum Street on December 6, 2010[:] the presence of gasoline and other ignitable liquids, as detected by a specialized accelerant sniffer dog and confirmed by forensic scientist Jessica Mulhollem, along with the behavior of the fire as observed by firefighters on the scene support that inference." Trial Court Opinion at 3 (unpaginated).

The Commonwealth's case demonstrated a deterioration of Appellant's relationship with his wife; she was having an affair with another man, and the Appellant had previously threatened her life on several occasions. The forensic evidence established that the victim was then strangled while laying on her back, on the floor of her bedroom, still in the position in which she was laying

when she had been recently vaginally penetrated. The semen found in the victim resulting from that penetration is several quintillion times more likely than not to have been the Appellant's. On the evening in question, only the Appellant, his wife, and his children were present in the home, and, as noted by the trial court:

> "[t]here is also substantial evidence to infer that nobody entered or exited the building before the fire was lit, based upon the family's dogs' failure to respond to any alleged intruders, the non-activation of the family's home security system on the first floor, and the neighborhood security cameras not capturing anyone fleeing the scene of the arson."

Trial Court Opinion, at 3-4 (unpaginated)(internal citations omitted).

On Appeal, Mr. Montalvo-Rivera seeks to invoke an exception to the standard of review outlined above, as was employed in *In the Interest of J.B.*, 189 A.3d 390 (Pa. 2018). This exception would permit this Court to set aside "the factual findings and credibility determinations rendered by the finder of fact," and would "compel[] [us] to reverse a legally erroneous conviction," if "the entire body of evidence introduced at trial which furnished the basis for an appellant's conviction is so deficient that it does not reasonably support a finding of guilt beyond a reasonable doubt, as a matter of law." Appellant's Brief at 13-14. Appellant bases this proposed deviation on his assertion that his theory of the case is at least "equally consistent with" the evidence as is Commonwealth's. Appellant's Brief at 19. We strongly disagree with his assessment. Rather, we adopt the well-reasoned, and well-supported, opinion

of the trial court regarding the Commonwealth's thorough rebuttal of Appellant's theory.

"Appellant's arguments at trial did not raise substantial or reasonable doubt as to the facts the Commonwealth presented, and additionally were thoroughly rebutted by the Commonwealth's expert testimony. Appellant argued that multiple unidentified assailants allegedly broke into the house at 14 North Plum Street and knocked him unconscious with a blow to the back of his head. After being unconscious for an extended period of time no less than 45 minutes, Appellant allegedly woke up on the floor with his hands tied, surrounded by smoke from the burning house. He then allegedly escaped from the open bathroom window.

Setting aside Appellant's subsequent claims about the identity and motive of the supposed assailants, the condition of Appellant's body upon examination by emergency medical technicians does not corroborate his account. At trial, the Commonwealth presented the report and testimony of forensic pathologist Dr. Wayne Ross, a highly skilled and qualified member of his profession, regarding the physical state of Appellant after the fire. Ross, upon reviewing Appellant's CT scans and hospital records following the fire, found that to a reasonable degree of medical certainty that Appellant did not experience a traumatic brain injury, exhibiting no direct signs of injury to the brain or subsequent post-concussion syndrome. This presentation - or lack thereof – was corroborated by other witnesses who identified Appellant during and after the fire, especially the emergency physician who examined him. According to Dr. Ross, if Appellant had been hit on the back of the head hard enough to be unconscious for the alleged amount of time, to a reasonable degree of medical certainty there would have been more evidence of damage than a 2-centimeter square bruise. [] There was no evidence in the medical record that Carlos Montalvo-Rivera showed any change in balance, vision, memory compatible with being knocked unconscious for a minimum of 45 minutes .... there was no evidence in the medical record that he showed symptoms of headache or sensitivity to light. There were no findings compatible with being struck by a blunt object. []

Additionally, Dr. Ross testified about Appellant's carboxyhemoglobin level – the measure of carbon monoxide

absorption into the blood as a result of exposure to smoke. Dr. Ross indicated that a value of less than 4 is a "normal" result, and that individuals who smoke recreationally usually have a value of at most 8. Earlier expert testimony from the emergency physician Dr. Trystan Davies indicated that values over 20 may require hospitalization, and a value over 30 would be life-threatening. Dr. Ross testified directly to the correlation between an individual's carboxyhemoglobin level and the potential harm caused by smoke inhalation: '... when you're in a lot of smoke, there's a lot of carbon monoxide, you take a few breaths of all that smoke and everything, it will raise your level 30, 40 percent and it's lights out after that.' Appellant's oldest child, Carlos Montalvo-Rivera Jr., quickly escaped from the building along with his two sisters, only receiving minor burns on his right hand. His carboxyhemoglobin level was 0.7. Appellant's older daughter, Kiana, was the last to leave the building, experiencing severe burns to her arms and neck, covering 22 percent of her body. Her carboxyhemoglobin level was 1.0. Dr. Ross testified that he discovered in his December 7, 2010 autopsy of Olga Sanchez, Appellant's wife, that her carboxyhemoglobin level was 9.5. Dr. Ross testified that this level was the result of her taking a "partial breath" before dying during the fire, as she had already been rendered unconscious due to compression of the oral pharynx depriving her brain of oxygen.

Appellant allegedly spent at minimum 45 minutes unconscious inside of the burning building, awoke to smoke so thick he 'could not see in any direction,' and somehow made it to and out of the bathroom window, with his hands tied. Appellant's measured carboxyhemoglobin level was 3.2. The numerical value of the carboxyhemoglobin test is a percentage of the named substance present in the blood sample. According to Dr. Ross, if Appellant's account of events was accurate, to a reasonable degree of medical certainty he would have had a carboxyhemoglobin level of "40, 50, 60 percent." Appellant, to a reasonable degree of medical certainty, would also be dead:

'that is, if one wakes up in a room, whether it's 40, 45 minutes, 15, 10 minutes and there's smoke everywhere to the point where one is blinded and there's so much smoke, there's going to be so much carbon monoxide in that smoke, you breathe it in, take a few breaths of all that smoke in there, it will kill you.'

Dr. Ross, also stated in his report that if Appellant would have survived such conditions, his measured levels would be substantially higher. Appellant's attested levels of carboxyhemoglobin more closely align with the account presented by several witnesses to the fire, where Appellant was seen attempting to enter the building as the fire department arrived. Appellant would also to a reasonable degree of medical certainty have substantial burns both externally and internally due to the heat and the smoke, which were not present during medical examination."

Trial Court Opinion at 4-7 (unpaginated)(internal citations omitted).

In consideration of the foregoing, it is reasonable to infer from the evidence: that Appellant was the only person in the room with the victim when she died; that she was strangled to the point where she lost consciousness; that the fire was lit in that same room, intentionally, with use of a chemical accelerant; that the victim died as a result of strangulation and exposure to the fire and resulting smoke; and that Appellant had had intercourse with her while she lay on her back; she did not move from that position prior to her death. Therefore, we find that the Commonwealth clearly adduced sufficient evidence to carry their burden, and Appellant's first issue merits no relief.

The remainder of Appellant's issues concern the admission of testimony. In addressing these claims, we apply the following standard of review:

"The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. Our standard of review of a challenge to an evidentiary ruling is therefore limited."

***Commonwealth v. Williams***, 2020 PA Super 246, 241 A.3d 1094, 1101 (Pa. Super. 2020) (citation omitted).

An abuse of discretion is more than "a mere error of judgment," but rather will only be found where:

> "[T]he [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. Importantly, [this C]ourt should not find that a trial court abused its discretion merely because [we] disagree[ ] with the trial court's conclusion. Indeed, when reviewing the trial court's exercise of discretion, it is improper for [this C]ourt to 'step[ ] into the shoes' of the trial judge and review the evidence *de novo*. In other words, [this C]ourt may not disturb a trial court's discretionary ruling by substituting its own judgment for that of the trial court."

***Commonwealth v. Gill***, 651 Pa. 520, 206 A.3d 459, 467 (Pa. 2019) (citations and some quotation marks omitted).

In his second issue, Appellant contends that the lower court improperly admitted the testimony of Officer Greathouse concerning a statement made by eye-witness Kacey Wynn relaying to the officer the location of a cord which had been wrapped around Appellant's hands. We disagree with Appellant's characterization of this testimony as hearsay.

Pursuant to Pennsylvania Rule of Evidence 801, "hearsay" is a statement which "the declarant does not make while testifying at the current trial or hearing," and which "a party offers in evidence to prove the truth of the matter asserted in the statement;" the admission of hearsay is prohibited by Pennsylvania Rule of Evidence 802. However, it is well-settled that "an out[-]of[-]court statement offered not for its truth but to explain the witness's course of conduct is not hearsay." ***Commonwealth v. Rega***, 933 A.2d 997, 1017 (Pa. 2007) (citing ***Commonwealth v. Sneed***, 526 A.2d 749, 754 (Pa.

1987)); *see also Commonwealth v. Weiss*, 81 A.3d 767, 805-806 (Pa. 2013). Further, erroneous admission of hearsay evidence is harmless where such evidence is merely cumulative of other untainted, substantially similar evidence. *Commonwealth v. Koch*, 106 A.3d 705, 721 (Pa. 2014)(citing *Commonwealth v. Johnson*, 576 Pa. 23, 41-42, 838 A.2d 663, 674 (2003)).

The testimony at issue in the present case is recorded in the transcript as follows:

> "Q. [...] You said you had spoken with Kacey Wynn at the scene. What did you learn from speaking to him at the scene?
>
> A. Mr. Wynn said that a gentleman had exited the foot alley between 14 and I guess it would be 12 North Plum Street with his hands down behind his back with some sort of cord. Mr. Wynn had attempted to remove the cord, was unable to do so. Another witness, Mr. Jonathan Santiago, was able to yank on the cord so it was removed from this person's hands or wrists.
>
> Q. And did you ask Mr. Wynn where the cord was?
>
> A. At some point I asked where the cord was, yes.
>
> Q. Okay. And so he – he told you where this cord was and you were able to go there to collect it?
>
> A. Yes.
>
> Q. Okay. So you collected the wire cord for evidentiary purposes?
>
> A. I did."

N.T. at 269.

The Commonwealth then proceeded to have Officer Greathouse identify on a map the precise location from which the cord was recovered. *Id.* at 271.

Later that same day, the Commonwealth called Kacey Wynn to testify as to what he had observed on the day of the fire outside Appellant's home.

Here, we find no abuse of discretion in the lower court's admission of Officer Greathouse's testimony. After review of the record, it is clear that the testimony was offered for a non-hearsay purpose: to explain the course of events which led to the collection of the cord, to which Officer Greathouse was directed by Mr. Wynn. To the extent this testimony could be construed as hearsay, it is merely cumulative with the untainted and substantially similar testimony offered by Mr. Wynn at trial. As such, Appellant's second issue merits no relief.

In his third issue, Appellant argues that the trial court erroneously permitted Detective Bonilla to offer expert testimony, both because Detective Bonilla was not qualified to render an opinion on the subject at issue and because the Commonwealth failed to provide advance notice pursuant to Pa.R.E.573.

For context, this matter concerns a Spanish-language text message sent from the victim's phone to her brother Amauris on the morning of the fire, appearing to be from her murderer. N.T. 1025-1026. In that text, the author claims that the murder of Olga Sanchez was an act of revenge against her brother, Amauris, and the text refers to Amauris as a "chivato," meaning snitch. *Id.* Amauris was called to the stand by the Commonwealth, and relayed that he had previously testified against several men in federal court

in cooperation with the DEA. N.T. 992-993. The four men against whom Amauris testified were all Mexican. N.T. 1507. Amauris testified that he didn't believe the fire had anything to do with his cooperation, because, he "knew that [the text] was not a Mexican talking." N.T. 992-993. In his brief, Appellant explains that Detective F was called by the Commonwealth to opine on whether "the use of the word *chivato* for snitch in the text message was inconsistent with the message having been sent by a Mexican speaker," which would have supported Amauris' position that the fire was unrelated to his cooperation with the DEA. Appellant's Brief at 26.

We will first address whether Detective Bonilla was qualified to offer an expert opinion on the frequency of occurrence, or the non-occurrence, of the word "chivato" in Mexican Spanish. We find Appellant's statement of the law relevant to this inquiry to be accurate:

> "Pa.R.E. 702 governs testimony by expert witnesses. It provides in pertinent part that '[ a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if... the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson' and if it 'will help the trier of fact to understand the evidence or to determine a fact in issue.' Under Pennsylvania law, the standard for qualification of an expert witness is a liberal one. In order to qualify as an expert witness in a given field, a witness normally need only possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience. If an expert witness has any reasonable pretension to specialized knowledge on the subject under investigation, she may testify and the weight to be given to such testimony is for the trier of fact to determine"

Appellant's Brief at 29 (*citing **Povrzenich v. Ripepi***, 257 A.3d 61 (Pa. 2021))(internal citations omitted).

In looking to his qualifications on the record, we see that Detective Bonilla is a fluent Spanish speaker, having been born into a Spanish-speaking family in New York. N.T. at 1017-1018. He is a veteran law enforcement officer with over thirty years of service who, in the course of his duties, has been certified as a Spanish-English interpreter in both state and federal courts. **Id.** Through his career, he has performed interviews in Spanish, served as a translator for English-speaking officers conducting interviews with Spanish speakers, and has translated and transcribed interviews conducted in Spanish for use in court proceedings. **Id.**

Regarding his familiarity with the Mexican dialect, specifically, the detective testified that he had worked on cases concerning transcribing Mexican speakers' words hundreds of times, that he was familiar with Mexican gangs and their language usage through his involvement with "Gangs Across America," and various investigations, and further, on a personal level, that he has Spanish-speaking family members from Mexico. **Id.** at 1021. As concerns comparing that dialect with non-Mexican dialects, the detective clarified that in the course of his life, both personal and professional, he has spoken with Spanish-speaking people from virtually every country where Spanish is spoken, and he has family members from numerous Spanish-speaking countries in North, Central, and South America. **Id.** at 1016-1017. Thus, we

are satisfied that Detective Bonilla has, at least, a "reasonable pretension to specialized knowledge" of Mexican Spanish as compared to other Spanish dialects, and the trial court did not abuse their discretion in allowing his expert testimony on this subject.

We now turn to the issue of notice of intent to introduce expert testimony. Again, we find Appellant's statement of the law relevant to this issue accurate:

> "Rule 573(D) imposes a continuing duty to disclose 'additional evidence, material, or witnesses[,] subject to discovery or inspection[.]' Moreover, this Court has repeatedly emphasized that the purpose of Rule 573 is to 'permit parties in criminal matters to be prepared for trial' and that 'trial by ambush is contrary to the spirit and letter of those rules and will not be condoned.'"

However,

> "discovery violations do not automatically entitle an appellant to a new trial; the appellant must demonstrate that the violation resulted in prejudice. Our case law suggests that prejudice in this context requires an appellant to demonstrate that a timelier disclosure would have affected his trial strategy or otherwise resulted in prejudice in the typical outcome determinative sense."

Appellant's Brief at 27-28(citing **Commonwealth v. Dunn**, 300 A.3d 324 (Pa. 2023)(internal citations omitted)(footnote omitted)).

We also note that Rule 573 "provides a variety of remedies for discovery violations," when they occur, and "regardless of whether a discovery violation has occurred involving an expert witness, the court, upon motion, may order that the expert prepare, and that the attorney for the Commonwealth disclose, a report stating the subject matter on which the expert is expected to testify; the substance of the facts to which the expert is expected to testify; and a

summary of the expert's opinions and the grounds for each opinion." ***Commonwealth v Dunn***, 300 A.3d 324, 347 (Pa. 2023). Where a violation has occurred, a continuance is "generally deemed sufficient to eradicate possible prejudice and enable the defendant to assimilate new information." ***Id.***

Here, the Commonwealth did not provide any notice to the defense prior to trial regarding Detective Bonilla's expert testimony; instead, they proceeded on the erroneous belief that the detective could testify as a lay witness. N.T. 833. Following objection by the defense, the trial court correctly ruled that the proposed testimony at issue was, clearly, an opinion requiring an expert witness; the court then instructed the Commonwealth to have Detective Bonilla prepare a report to be served upon the defense by end of business that day, and instructed the Commonwealth to recall the detective several days later, affording the defense time to review the report and prepare a response. ***Id.*** at 838, 841. We find that the trial court's remedy was consistent with our holding in ***Dunn***, *supra*, and therefore the trial court did not abuse its discretion in admitting this testimony.

We also further note that the record does not support a finding of prejudice arising from this ruling, especially where trial counsel offered effective cross examination of the detective. N.T. 1029-1030. Detective Bonilla ultimately testified that the use of the word "chivato" indicated a Cuban dialect, and he repeatedly allowed for the possibility that the text message may indeed have

been written by a Mexican-Spanish speaker due to the proximity of Cuba and Mexico. *Id.* Further, the detective agreed that the Appellant was Puerto Rican, not Cuban, and the word "chivato" is not a common word in Puerto Rican Spanish either, which uses the same words for "snitch" as Mexican Spanish. *Id.* Thus, Detective Bonilla's testimony ultimately made no more likely than not either the Commonwealth or the Appellant's theory concerning the origin of the text. Thus, this issue merits no relief.

In his fourth and fifth issues, Appellant contends that the lower court improperly admitted the testimony of Julian Sanchez, the victim's brother, and Rosaura Reyes, the victim's friend, respectively, who both testified to events involving prior threats made by Appellant to the victim. However, the defense failed to object to the admission of either Mr. Sanchez' or Ms. Reyes' testimony at trial, raising both issues for the first time in his 1925(b) concise statement. As such, both issues are waived, and merit no relief. *See* Pa.R.A.P. 302(a); *Commonwealth v. Berrios*, 434 A.2d 1173 (Pa. 1982); *Commonwealth v. Clair*, 326 A.2d 272 (Pa. 1974).

In his sixth issue, Appellant contends that the trial court erroneously admitted the testimony of Dolores Ojeda, the victim's sister, either because it was improper evidence of a prior bad act, or, in the alternative, because it was hearsay.

Pursuant to Pa.R.E. 404(b)(1), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a

particular occasion the person acted in accordance with the character."
However, "[such] evidence may be admissible for another purpose, such as
proving motive, opportunity, intent, preparation, plan, knowledge, identity,
absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). Further, in the
context of a criminal case, "[such] evidence is admissible only if the probative
value of the evidence outweighs its potential for unfair prejudice," and
additionally, "the prosecutor must provide reasonable written notice in
advance of trial so that the defendant has a fair opportunity to meet it, or
during trial if the court excuses pretrial notice on good cause shown, of the
specific nature, permitted use, and reasoning for the use of any such evidence
the prosecutor intends to introduce at trial." Pa.R.E. 404(b)(2), (3).

Here, the challenged testimony was the subject of the Commonwealth's
Notice of Intent to Intro. Evid. Of Other Crimes, Wrongs or Acts, filed on
February 10, 2023. In the testimony at issue, Ms. Ojeda would go on to state
that in August or September of 2009, just prior to the December 6, 2010, fire,
the victim had called her and asked for Ms. Ojeda to come to the couple's
Plum-street house and to bring her husband Chris. N.T. 1284. Ms. Ojeda did
so, and she described the victim and Appellant's house being in a state of
disarray, with broken ceramics and glass covering the floor. N.T. 1286. The
victim was sitting on the stairs to the second floor, and Appellant was standing
nearby, in the living room on the first floor. N.T. 1287. At that time, Ms. Ojeda
asked the victim what had happened, and the victim stated that there had

been a fight between herself and Appellant. *Id.* The victim then told Ms. Ojeda that the Appellant had threatened to kill her, to which Appellant responded "yes, I did tell her that if I have to[,] I'm gonna kill her like a dog." N.T. 1292.

The trial court recounted their ruling as follows:

> "Based upon the information provided in the Commonwealth's required pre-trial notice concerning this testimony, Ms. Ojeda's testimony presents many relevant facts relating to the crimes charged, such as Appellant's potential motive for his alleged actions, his subsequent intent to commit the alleged offenses, and the lack of a mistake or accident leading to the alleged arson. […] This Court, applying its discretion, found that this information would be more probative to the case than unfairly prejudicial against Appellant ."

Trial Court Opinion at 13, (unpaginated)(internal citation omitted).

Here, as the Commonwealth satisfied the procedural requirements of Pa.R.E. 404(b)(3) by filing their notice well in advance of trial, and the challenged testimony fell squarely within the permissible purposes as outlined in Pa.R.E. 404(b)(2), we see no basis for finding an abuse of discretion. The probative value of the evidence is substantial, and there is little risk of unfair prejudice. Thus, this issue merits no relief on the basis of Pa.R.E. 404(b).

Appellant also asserts that Ms. Ojeda's testimony constitutes inadmissible hearsay, but does little more than assert as much. The entire argument to this point as presented in his brief is as follows:

> "Similarly, Dolores Ojeda's testimony was improperly admitted. Ojeda testified that she went over to the house sometime prior to the incident and that there had been a fight. Much of what she testified to she did not observe; rather, she was recounting what the decedent told her, i.e[.], that they had been involved in a fight, what had occurred, etc. This of course was hearsay without

- 21 -

> an objection [sic] and therefore inadmissible. See *Commonwealth v. Fitzpatrick*, 255 A.3d 452 (Pa. 2021). She also said that in the context of what was very clearly a heated argument Mr. Montalvo-Rivera said that he would kill his wife like a dog."

Appellant's Brief at 34.

The very next line of his brief begins "[a]gain, and notwithstanding the issue of hearsay," before going into an argument addressing the appropriateness of the admission of testimony pursuant to Rule 404(b). Appellant's Brief at 34. This is mere issue spotting, not a developed argument, and "[t]his Court will not act as counsel and will not develop arguments on behalf of an appellant." **Commonwealth v. Kane**, 10 A.3d 327, 331 (Pa. Super. 2010). **See also, Commonwealth v. Buterbaugh**, 91 A.3d 1247, 1262 (Pa. Super. 2014) (*en banc*), *appeal denied*, 104 A.3d 1 (Pa. 2014) ("The Pennsylvania Rules of Appellate Procedure require that each question an appellant raises be supported by **discussion and analysis of pertinent authority**, and failure to do so constitutes waiver of the claim.") (citation omitted, emphasis added). Thus, this issue is waived and does not entitle Appellant to relief.

In his seventh issue, Appellant contends that the trial court erred by permitting Detective Nickel to testify as to the content of the victim's phone records as a lay witness, or, in the alternative because reliance on the phone record's legend was hearsay.

As aptly noted by the Commonwealth, this Court has very recently addressed the admissibility of "testimony about the contents of cell phone

records," and observed that "while expert testimony is permissible, there is precedent for the proposition that, where the testimony is non-technical and not beyond the comprehension of laypersons, said testimony is not expert testimony." ***Commonwealth v. Grubbs***, 330 A.3d 444, 450 (Pa. Super. 2025). We offered as an example a recent United States Third Circuit Court of Appeals, which concluded:

> "where a witness testifies merely to the contents of cell phone records, including cell-site location information ("CSLI"), or explains that cell phones are designed to find the strongest signal, this testimony does not require scientific, technical, or other specialized knowledge, because any cell phone user of average intelligence would be able to understand that the strength of one's cell phone reception depends largely on one's proximity to a cell phone tower."

***Id.*** citing ***U.S. v. Baker***, 496 Fed. Appx. 201, 204 n.1 (3d Cir. 2012) (unpublished).

Here, after review of the record, we are satisfied that Detective Nickel did very little more than relay information found in the AT&T service records relative to Olga Sanchez' phone and the legend provided therewith, and certainly did not offer any testimony requiring scientific, technical, or specialized knowledge beyond the understanding of any phone user of average intelligence. We find no abuse of discretion in the admission of this testimony; this issue merits no relief.

In addressing Appellant's assertion that Detective Nickel's reliance on the cell phone records' legend constituted hearsay, we incorporate our above discussions of waiver relative to Appellant's fourth, fifth, and sixth issues.

Here, Appellant did not raise a hearsay objection at trial regarding the phone record legend, did not raise that issue in his concise statement, and, in his brief, merely issue spots, stating:

> "[m]oreover, the 'legend' was hearsay, and unlike expert witnesses, lay witnesses cannot rely on hearsay when giving their opinions. *See Hammel v. Christian*, 610 A.2d 979 (Pa. Super. 1992) (even though a lay witness' opinion is admissible, statements contained therein must comport with the other relevant rules of evidence, including the hearsay rule). This was wholly inadmissible lay opinion testimony."

Appellant's Brief at 36.

As such, this final issue is waived.

For the foregoing reasons, we find that Appellant has presented no issue meriting the requested relief. Accordingly, we affirm.

Judgment of sentence affirmed.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 7/9/2025

- 24 -